**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UTELL INTERNATIONAL, INC., a subsidiary of Utell International (UK) Limited, Respondent.**

**No. 282, Docket 84–4080.**

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1984.

Decided Dec. 7, 1984.

Daniel R. Pollitt, N.L.R.B., Washington, D.C. (Wilford W. Johansen, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich, Attorney, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Joel E. Cohen, New York City (John F. Gibbons, Kelley Drye & Warren, New York City, of counsel), for respondent.

Before OAKES, WINTER, Circuit Judges, and CLARIE, District Judge.[*]

OAKES, Circuit Judge:

This case involves a so-called technical refusal to bargain by an employer in order

[*] Of the United States District Court for the District of Connecticut, sitting by designation.

to obtain judicial review of the National Labor Relations Board's certification of a union, in this case, Local 1101 in the Communication Workers of America, AFL–CIO (CWA). The Board is petitioning the court for enforcement of its order dated April 30, 1984, 270 N.L.R.B. No. 76, directing Utell to bargain with the CWA in a unit of employees for which the Board on November 4, 1983, had certified the CWA as exclusive bargaining representative. Utell concedes that it refused to bargain but contends that the CWA was improperly certified. The basis for the claim is its election objection 4, alleging that the union or others acting as its agents made false and inflammatory racial appeals to the employees so as to taint the election. Accordingly, the only question in the case is whether the Board acted properly in overruling this objection and certifying the union.[1]

Objection 4 calls into play the standard for evaluating racial statements and appeals to racial prejudice made during election campaigns as set forth in *Sewell Manufacturing Co.*, 138 N.L.R.B. 66 (1962). There, the Board stated that appeals to racial prejudice "create conditions which make impossible a sober, informed exercise of the franchise." *Id.* at 71. However, while asserting that "appeals to racial prejudice on matters unrelated to the election issues ... have no place in Board electoral campaigns," *id.*, the Board also recognized

that standards could not "be so high that for practical purposes elections could not effectively be conducted," *id.* at 70. Thus the Board concluded that "a relevant campaign statement [should not] be condemned because it may have racial overtones," *id.* at 71, and an election will not be set aside "[s]o long ... as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals," *id.* at 71–72 (emphasis in original).

We have very little to go on in the way of factual findings. The Board simply accepted the hearing officer's report, which finds it unnecessary to resolve conflicts in the testimony because it suffices "to find that the issue of the Employer's conduct appears to antedate [the union's] campaign and that the discussion of race by employees allegedly aligned with [the union] was not an appeal to racial prejudice." However, we find it possible to decide the case without the benefit of further findings by assuming that the company's allegations are true and by referring to uncontradicted testimony in the record.

If we credit all of the company's allegations, the record shows that the following statements were made by employees Rosalind Calvert, Victoria Finley, and John Shea during the campaign.[2] Calvert told em-

---

1. Objection 4 reads:

    CWA and/or others acting in its behalf made false, inflammatory and threatening statements concerning the Black and Puerto Rican employees in the voting unit to get them to vote for CWA, including the statements that, if CWA did not win, Utell would fire all the Black and Puerto Rican employees and that Karen Grant was fired because of her race. In any event, the issues of race and ethnic origin were injected into the campaign and tainted the election.

2. The company does not contend that either union organizer Edward Baxter, union business agent Art Brown, or any union literature interjected race into the campaign. Rather, it contends that the union is responsible for the campaign statements and acts of these three employees, Calvert, Shea, and Finley, both because they belonged to an underground "in-house commit-

tee" and because Baxter implicitly condoned their racial statements by doing nothing to disassociate himself or the union from them. Baxter apparently attended a meeting during which several employees, including Calvert, stated their belief that employee Karen Grant was fired in part because she was black. Baxter himself said very little at the meeting and did not mention the subject of race; but the company argues that his silence constituted a ratification of all statements made.

Assuming that the union was responsible for statements made by Calvert, Shea, and Finley, we need not sort out contradictory testimony to decide whether they were union agents. However, we note that the Board makes a strong argument that they were not. Baxter's silence at the employee meeting indicates less that he agreed with their statements than that he prudently reserved judgment. Moreover, although

ployees that she "believed [Director of Administration] Heather Blaseby [was] a racist" and that Blaseby "may have" fired employee Grant for racist reasons. She also expressed her feelings that "the darker you were, the better chances that you would be fired unjustly" and that "we may have a better chance of stopping [unjust firings] with a union." Finally, Calvert repeated two statements made to her by other individuals, one by employee Gladys Solis, that company reservation manager Eneida Olivieri had told Solis that Puerto Rican employees would be discharged first if employees "didn't stop with this union business," the other by former company manager Marie Curran, that Blaseby had once criticized Curran for hiring an employee who was "too Black." Employee Finley discussed with another employee Olivieri's alleged statement about Puerto Rican employees. Employee Shea told employees his belief that Blaseby discharged Grant for racial reasons and that unjust firings would cease if the union came in.

We agree with the Board that the employees' statements as above outlined were not deliberate inflammatory appeals designed to incite racial hatred. This is not a case like *NLRB v. Eurodrive, Inc.*, 724 F.2d 556, 558 & n. 4 (6th Cir.1984), as Utell would have us believe. In *Eurodrive* the union organizer clearly appealed to white employees' racial prejudice by promising to work to reinstate a white employee discharged for racially harassing the compa-

ny's only black employee. Nor is this a case of a "sustained appeal to racial prejudice" as referred to in *Coca-Cola Bottling Co.*, 232 N.L.R.B. 717, 717 (1977). *See also NLRB v. Silverman's Men's Wear, Inc.*, 656 F.2d 53, 59 n. 10 (3d Cir.1981) (distinguishing the "legitimate and germane issue" of employer discrimination from the illegitimate appeal to prejudice demonstrated by a racial slur).

We also agree with the other circuits that have passed on the issue that the *Sewell* test for truth and relevancy does not apply here but rather is applicable only to inflammatory racial appeals. In this view, false but non-inflammatory statements are reviewed according to the usual test for misrepresentations. *See, e.g., Peerless of America, Inc. v. NLRB*, 576 F.2d 119, 125 (7th Cir.1978); *NLRB v. Bancroft Manufacturing Co.*, 516 F.2d 436, 442–43 (5th Cir.1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976).

Assuming that the employees' statements were misrepresentations, our task then is to determine their probable impact on the election on the basis of the factors derived from *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962), as set forth in *NLRB v. Nixon Gear, Inc.*, 649 F.2d 906, 911 (2d Cir.1981).[3] These factors are "(1) whether the other party had adequate opportunity to reply and correct the [here assumed] misrepresentations; (2) the extent to which the declarant could reasonably be viewed by the employees to be in a position to

---

active in the union campaign, Calvert, Shea, and Finley were not employed by the union, had no official position or designation in the union, did not receive any money or expenses from the union, and were not authorized to speak on behalf of the union. Shea and Finley did some literature distribution, supported the union generally and replied to other employees' questions, but there is no record evidence that they drafted literature, solicited cards, made telephone calls, or solicited union meetings. Calvert, on the other hand, did engage in card solicitation and telephoning, as well as distributing literature. She testified, however, that the campaign was a collective effort and that "everybody was an organizer." There was certainly no formal in-plant organizing committee here as in *PPG Indus., Inc. v. NLRB*, 671 F.2d 817, 821–23 (4th Cir.1982). Nor was this a case like *Local 340,*

*Int'l Bhd. of Operative Potters*, 175 N.L.R.B. 756, 759 (1969), where because official union agents were virtually absent from the plant the company employee found to be an agent held himself out as a union spokesman. Rather, it appears that Baxter prepared all but one piece of the union literature and personally distributed the literature on the company premises each morning; and that he invited all employees to the several union meetings, attended the meetings himself, and instructed employees to refer their questions to him.

3. The Board overruled *Hollywood Ceramics Co.* in *Shopping Kart Food Mkt., Inc.*, 228 N.L.R.B. 1311, 1311 (1977), but reinstated the *Hollywood Ceramics* test in *General Knit*, 239 N.L.R.B. 619, 620 (1978).

know the facts; (3) the ability of the employees to evaluate the statement on the basis of their own independent knowledge of the facts; and (4) the influence it might reasonably have had upon the employees." *Id.* While the hearing officer gave us no facts in this regard and indeed did not find there were misrepresentations, we nevertheless think that we can analyze the *Hollywood Ceramics Co.* factors on the record we have before us.

Utell fully rebutted employee allegations of racism. In a special meeting of all employees called on May 6, 1982, Blaseby vigorously denied that she was a racist or that the company was going to fire black and Puerto Rican employees, telling employees that the rumors "were totally untrue" and "ridiculous" because the company employed many minority employees. On May 10 she distributed a memo to all employees again vehemently denying that she had discharged employee Grant for racist reasons or that she was a racist. Employee Shea also neutralized the rumor that Puerto Rican employees would be fired first upon election of the union by calling it "ridiculous" and "nonsense."

There was no indication that Calvert, Shea, or Finley were in any better position than any other employee to know the facts involved. Rather, Utell's thirty-odd employees could independently observe Utell's hiring and firing patterns and independently evaluate rumors about management's racist attitudes and actions in light of these historical patterns. And while the alleged misrepresentations may have influenced the employees' perceptions of Utell and of the need for a union, it must be remembered that these statements were not made, and certainly not expressly ratified, by any union official. Moreover, the exhibits in evidence suggest that the typical economic issues were the essential themes of the election campaign; accusations of racism are conspicuously absent from these exhibits. For example, the company warned employees about the CWA's strike record; reminded them that during a strike they would lose pay, benefits, and possibly their jobs; and cautioned that the union

could not guarantee anything and that the employees might lose through collective bargaining. The union told of the benefits it could offer in terms of grievance procedures and pointed out that the company had hired a "union-busting law firm." While union literature referred once to Karen Grant's discharge, it implied that she had been fired not because she was black but because she had been active on behalf of the union.

Amply rebutted, lacking any special authority, subject to employees' independent assessment and tangential to key campaign issues, any misrepresentations made by Utell employees probably had little effect on the union election. We can safely say then that under the *Hollywood Ceramics Co.* factors the election here need not be set aside.

Petition enforced.