872 F.2d 1026
 133 L.R.R.M. (BNA) 2344
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MARTHA WHITE FOODS, INC., Petitioner and Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner.
 Nos. 88-5637, 88-5720.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1989.
 
 Before KEITH, NATHANIEL R. JONES, and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM:
 
 
 1
 Petitioner, Martha White Foods, Inc. ("the Company") seeks to review and set aside an order issued by the National Labor Relations Board ("NLRB"). The NLRB has filed a cross-petition seeking enforcement of the order. For the following reasons, the petition for review is denied and we enforce the order of the NLRB.
 
 I.
 
 2
 On January 16, 1984, the Aluminum, Brick and Glass Workers International Union, AFL-CIO, CLC ("the Union") petitioned the NLRB for certification as the collective bargaining representative of the Company's production and maintenance employees. The NLRB approved the petition for certification and conducted an election of all the full- and part-time employees at the Company's Jackson, Tennessee plant on March 8, 1984. There were approximately 84 eligible voters; one ballot was disqualified, 34 were cast for the Union, 31 against the Union, and the remaining 18 were challenged.
 
 
 3
 On March 15, 1984, the Company filed objections to the election, which included an allegation that the Union "had appealed to the racial prejudice of the employees and sought to stress and exacerbate racial feelings throughout the election campaign." After investigating the challenges and objections, the Regional Director recommended that a hearing be conducted to determine whether the allegedly objectional union conduct invalidated the election. The NLRB adopted the Regional Director's report and a hearing was held on September 7, 1984. The hearing officer's report on objections issued on September 28, 1984, recommended that the NLRB override all of the Company's election objections and certify the Union. Despite objections filed by the Company, a majority of the NLRB members adopted the recommendations of the hearing officer and certified the Union as the collective bargaining unit of the Company's employees.
 
 
 4
 In January, 1988, the Company refused to respond to the Union's request for information or to begin negotiating a collective bargaining agreement. In response to the Union's charge of unfair labor practices, the NLRB issued a complaint alleging that the Company's lack of cooperation violated Section 8(a)(5) and (1) of the National Labor Relations Act ("the Act"), amended at 29 U.S.C. Sec. 158(a)(5) and (1). The Company admitted refusing to cooperate in order to challenge the validity of the Union's certification.
 
 
 5
 On June 9, 1988, the NLRB granted the Union's motion for summary judgment and ordered the Company to cease and desist from refusing to cooperate with the Union. The NLRB found that the Company had violated the Act by declining to provide the Union with the information it needed to negotiate a collective bargaining agreement for the Company's employees.
 
 II.
 
 6
 The Company alleged that the Union's certification as the employees' collective bargaining unit was invalid because the Union interfered with the employees' right to freely choose their representative. The Company specifically objected to events which occurred at a meeting held during the first week of the seven week campaign. This meeting was held on January 27, 1984, and was attended by approximately 40 employees, the majority of whom were black. At that meeting, the Union organizer, Revel Black ("Black"), criticized the Company's characterization of the employees as illiterate[1] saying that it suggested that they were "dumb." In discussing the statements of the General Manager, Paul Hampton ("Hampton"), Black referred to a campaign in Franklin where the employees had been called "niggers." Black noted that both companies were represented by the same law firm, therefore explaining the similarity in tactics. During the course of the meeting, Black told the employees that the Company was calling them "dumb niggers." Although there was some dispute as to what Black actually said, the NLRB concluded that Black probably incorrectly attributed the term "dumb nigger" to Hampton or other Company personnel.[2] Black's remarks at the January meeting, however, were the only reference the Union made to race during the entire seven week election drive and were made more than a month before the election.
 
 III.
 
 7
 The enabling act that created the NLRB gave the Board "a wide degree of discretion" to establish and refine the "safeguards necessary to conduct a fair [and free election.]" NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946); NLRB v. Waterman S.S. Corp., 309 U.S. 206, 226 (1940). Accordingly, as the responsibility for establishing the rules controlling election proceedings has been entrusted exclusively to the NLRB, the proper standard of review in cases where the NLRB applies its election rules to a particular set of facts is whether the decision is supported by substantial evidence. NLRB v. State Plating & Finishing Co., 738 F.2d 733, 737 (6th Cir.1984).
 
 
 8
 In 1962, the NLRB established specific guidelines for elections involving appeals to racial prejudice. See, Sewell Manufacturing Co., 138 NLRB 66 (1962). The NLRB concluded that "appeals to racial prejudice on matters unrelated to the election issues ... have no place in Board electoral campaigns. They inject an element which is destructive of the very purpose of an election." Id. at 71. Accordingly, the NLRB will set aside an election where a party "deliberately seek[s] to over stress and exacerbate racial feelings by irrelevant, inflammatory appeals" to racism. Id. at 71-72.
 
 
 9
 The Sewell standard recognizes that it is unrealistic to judge all racial references equally. Id. at 70. Therefore, the NLRB and the courts are careful to distinguish sustained appeals to racism such as existed in Seell,[3] from isolated racial statements which were not the focus of the election campaign. See State Bank of India v. NLRB, 808 F.2d 526, 542 (7th Cir.1986) (isolated racial remark was not "sufficiently close to the core theme of the campaign"); NLRB v. Utell Intl., Inc., 750 F.2d 177, 180 (2d Cir.1984) ("typical economic issues were the essential theme of the election campaign and the false accusations of racism were non-inflammatory"); Arlington Hotel Co., Inc. v. NLRB, 712 F.2d 333, 338 (8th Cir.1983) (isolated racial comment had no inflammatory effect).
 
 
 10
 Accordingly, in applying the Sewell standard to the facts of this case, the NLRB properly found that Black's statements did not rise to such a level "as to prevent the exercise of free choice by the employees in the election of their bargaining representative". Sewell, 138 NLRB at 71. Moreover, the NLRB found that Black's one-time remarks criticizing the Company's racism were not the focus of the campaign, nor were they intended to encourage racist attacks against particular ethnic or religious groups. Instead, Black's statement "represented an effort to denounce racial prejudice in another [the Company]."
 
 
 11
 In addition, a careful review of the record reveals that the Company failed to meet its burden of proof that Black's remarks interfered with the employees' exercise of free choice. Four employees testified that although they heard Black's statements, they were assured that Hampton had not made the remark allegedly attributed to him and that the statements had no effect upon the way they voted.
 
 
 12
 We, therefore, hold that the findings of the NLRB are supported by substantial evidence. Accordingly, for the reasons stated above the order of the NLRB is ENFORCED.
 
 
 
 [1]
 Just after the campaign began, the Company held a meeting with approximately 66 of its employees, 70 percent of whom were black. The General Manager, Hampton, reminded the employees that, since many of them could neither read nor write, they should be careful about allowing someone else to sign their union cards
 
 
 [2]
 According to the record only three witnesses heard Black's comments. One employee testified that Black attributed the word "niggers" to Hampton, another said that Black had not attributed the word to the manager or the Company, and the third witness testified that Black had used the word in connection with the Company's lawyers, not the General Manager
 
 
 [3]
 For other examples of sustained inflammatory appeals to racism, see YKK (USA), Inc., 269 NLRB 82, 84 (1984) (union officials admonished employees not to "let the Japs at YKK ... pull the wool over your eyes" and used other derogatory terms regarding the Japanese owner in handbills and at subsequent meetings); NLRB v. Katz, 701 F.2d 703, 705-708 (7th Cir.1983) (Catholic priest made remarks at a union meeting that the owners were Jewish and getting rich while the Catholic employees were poor and "killing ourselves for them," other racial and religious slurs were used during the course of the campaign)