**FAMILY SERVICE AGENCY SAN FRANCISCO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Service Employees International Union, Local 790, AFL–CIO, Intervenor.**

No. 98–1204.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1998.

Decided Jan. 15, 1999.

Paul B. Johnson argued the cause and filed the briefs for petitioner.

Sharon I. Block, Attorney, Norristown, PA, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Fred L. Cornnell, Supervisory Attorney.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In June 1996, the Service Employees International Union Local 790, AFL–CIO ("Union") began a campaign to unionize a daycare site operated by Family Service Agency San Francisco ("FSA"), a private agency hired by state and local authorities to provide child care to underprivileged children. The Union set about organizing the supervising teachers, who were in charge of six classrooms at the site, as well as the assistant teachers, teachers' aides, and the facility's office and support workers. In October 1996, the Un-

ion filed a petition with the National Labor Relations Board ("NLRB" or "Board") seeking a representation election among these employees. FSA objected to the proposed bargaining unit on the ground that supervising teachers were statutory supervisors and so disqualified under the National Labor Relations Act ("NLRA" or "the Act") from inclusion. After a hearing, the Board's Regional Director found that they were not supervisors and ordered an election in the petitioned-for unit. On appeal, the Board amended this ruling to permit the supervising teachers to vote subject to challenge. See Joint Appendix ("J.A.") at 42 (Order of Dec. 19, 1996).

The election was held on January 8, 1997. The union won 25 to 12, with one challenged ballot. At the pre-election conference, FSA did not challenge the ballots cast by supervising teachers. After the election, it filed the following objections: (1) the Union destroyed the laboratory conditions of the election by improperly appealing to racial prejudice during the election campaign; (2) the election was tainted by the involvement of supervisory teachers in the election process; (3) Union supporters engaged in improper electioneering during the voting; (4) the Union engaged in misconduct when its agents improperly invaded the workplace; and (5) the election was invalid because the Union failed to file reports required by the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 431(a), 431(b), 432 & 435.[1] The Board's hearing officer, after four days of testimony, issued a report which recommended that all of the objections be overruled. FSA filed exceptions with the Board, but the Board rejected them and instead adopted the hearing officer's findings and conclusions. The Decision and Certificate of Representative issued on October 17, 1997. FSA refused to bargain with the Union on the ground—the same raised in its objections—that the election was not conducted lawfully. J.A. at 107 (Answer to Complaint). The Union filed a complaint with the Board, charging that FSA violated

---

1. FSA also objected that the Union improperly threatened employees, made promises of monetary reward and made misrepresentations during the campaign. The Board's rejection of these objections was not raised here.

sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(a)(1) and (5), and the NLRB General Counsel subsequently brought an unfair labor practice charge against the agency. The Board granted the NLRB's motion for summary judgment, and FSA asks that we deny enforcement of the Board's order to bargain collectively.[2] The NLRB cross-petitions for enforcement.

We hold that FSA is estopped from attempting to litigate the question whether the election was tainted by the involvement of supervisors. FSA waived its right to a ruling on whether the supervising teachers are statutory supervisors during the prior representation proceeding, and may not bring that issue before this court. We also find that the Board reasonably concluded that FSA's other objections lacked merit.

## I. BACKGROUND

Teachers and administrators work in close proximity at FSA's Bryant Street site, serving 160 children aged two weeks to three years old. Each classroom is staffed by a supervising teacher, an assistant teacher, and teachers' aides. When the Union began its organizing campaign in June 1996, racial discord already characterized relations between African–American and Latina[3] employees. The supervisor of the center, Vivian Storey, who is African–American, testified that at some point before the Union's arrival, a Latina co-worker told Storey that she could not socialize with her African–American co-workers anymore because she had been harassed by another Latina. J.A. at 510. In addition, the employees took racially segregated lunch periods, with Latina workers eating from 12:30 to 1:30 and African–Americans from 1:30 to 2:30 p.m. J.A. at 552.

*The Language Issue*

The pivotal issue that drove a wedge between Latina and African–American workers—the alleged presence of a policy limiting use of Spanish in the classroom and front office—surfaced well before the unionization campaign. In early 1996, there were a series of meetings among administrators in which the staff addressed, among other things, complaints about Sandra Ramirez, who worked in the center's front office and dealt with agency clients. J.A. at 751–58 (testimony of Claudette Darley, operations manager). At one such meeting, according to Darley, one of Ramirez' supervisors, Ramirez was instructed to speak English whenever she was in a group of people that included non-Spanish speakers. J.A. at 767. Ramirez was told of an incident in which three African–American parents were standing in the office while the Latina staff conversed in Spanish, and Ramirez was warned that this could be considered insulting by non-Spanish-speaking parents. *Id.*; *see also* J.A. at 797 (notes from 1/11/96 staff meeting).

The language issue arose again on June 5, 1996, when a staff meeting was held among the teachers in Room 2. Among the teachers who attended were Phyllis Hogan, the African–American supervising teacher for the room; Edith Ruiz, a Latina teachers' aide; and Johnny Overton, an African–American substitute teachers' aide. According to testimony and contemporaneous hand-written notes from the meeting (it is not clear from the record who served as notetaker) a parent had complained about the Latina staff's speaking Spanish to her son. The notes from the meeting set forth the following: "It is appropriate to speak Spanish to children whose primary language is Spanish, *as long as it is in accordance with their parents' wishes*. It is appropriate to speak Spanish to Spanish-speaking parents in order to convey information or explain things more clear-

---

**2.** Certification by the Board is not an "order" subject to judicial review, *see American Fed'n of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), so review of certification proceedings must await a final order by the Board in an unfair labor practice proceeding (often called a "technical refusal to bargain") under sections 10(e) and (f) of the NLRA, as amended, 29 U.S.C. §§ 160(e) and (f). The record of the

certification proceeding becomes part of the record for review in the unfair labor practice case pursuant to section 9(d), 29 U.S.C. § 159(d).

**3.** We use the term "Latina" to refer to employees whose first language is Spanish because the Spanish-speaking employees at issue in this case are all women.

ly." J.A. at 796 (emphasis in original). "If a non-Spanish-speaking parent or staff member is nearby when Spanish is being spoken, a staff member will attempt to give a short explanation in English of what is being discussed so they don't feel unwelcome or uncomfortable; Ex: 'Hi ___. I was just explaining this memo to ___. I'll be right with you.' " *Id.*

Some time later in June, according to Ruiz, Ruiz was speaking Spanish to a parent and Hogan came into the room. Hogan "touched me on the shoulder and she told me, 'Remember.' And then she told me . . . that we were going to have a short meeting," Ruiz testified. J.A. at 706. Once the children went down for their naps, Hogan asked Ruiz whether she remembered that she should not speak Spanish, according to Ruiz, and Ruiz asked for a written policy regarding the language issue. J.A. at 706–07. This was followed by a tense interaction between Storey, who subsequently intervened, and Ruiz; Ruiz testified that Storey told her she was in America and should speak English, J.A. at 706, but Storey denied this and recalled that she told Ruiz each employee needed to be sensitive to other cultures, J.A. at 527. "My words was to her that there is a whole lot of rules and regulations that I do not like," Storey testified, "and I said if I could not follow the rules and stuff, then it was time for me to leave." *Id.*

Also at the end of June, the teachers in Room 7/9 held a staff meeting at which they discussed the use of Spanish. Notes from this meeting reflect mounting tension over the issue. Marva Stephens, the African–American supervising teacher in the classroom at the time, indicated on the "Meeting Outcome" form that "[t]o identify speech and language problems, staff will use English then Spanish to enhance receptive language skills, and to assist development by speaking English." J.A. at 804. But Lourdes Perez, a Latina teachers' aide, wrote in Spanish her own version of what happened at the meeting on the "Meeting Outcome" form. Perez testified that her notation reads: " 'Today, June 26, our supervisor once again has forbidden us. She does not want us to talk Spanish in the rooms. And that she does not care what

the Union' has said. . . ." J.A. at 726. At the hearing, Storey denied directing Stephens to implement an "English-only" language policy. J.A. at 570.

*The Organizing Campaign*

In their testimony Storey and other higher-ranking employees all unequivocally denied that FSA ever had an "English-only" language policy, but Latina employees felt that their supervisors were increasing pressure on them to stop speaking Spanish. When the Union began to hold meetings among employees in the prospective bargaining unit in the summer of 1996, J.A. at 512, the language issue was one of the first workplace problems that the Latina employees mentioned to Union organizer Ruben Garcia. J.A. at 719 (testimony of Lourdes Perez); J.A. at 735 (testimony of Ruben Garcia). Garcia testified that he referred the employees to La Raza Central Legal, a public interest law organization which specializes in Latino issues, in an effort to extricate the union from the language issue because it "in my experience [ ] shows to be a divisive issue." J.A. at 735. Garcia also testified that the Union never distributed literature addressing the language issue. J.A. at 739. Not surprisingly, the union drive was still racially divisive. Two African–American employees, Art Marshall, the cook at FSA, and Ann Douglas, a substitute teachers' aide, testified that they initially attended some Union meetings. As the campaign continued into the fall, however, Garcia conducted the meetings primarily in Spanish, with English translation. Marshall and Douglas thought that they were being denied a full understanding of what was said at the meetings, and Marshall, who had approached Garcia several times about his concerns that African–Americans had been left out of the organizing efforts, felt that the Union did not care about the concerns of African–American workers. Marshall said:

> . . . I even told him [Garcia], hey man, . . . some of the blacks kind of like want to bow out of this because we feel like our issues aren't being met and most of the Chicano issues are.
>
> He said, well, we'll get with that, you know. . . . I even told him how to go about

bringing the blacks back into the thing, but he kind of like ignored it, overlooked it or—that's the way I look at it.

. . . .

I just said that I think we should, you know, we should try to get together, you know, and keep blacks involved in this, because I was still strongly for the Union and then he kept saying, . . . we'll deal with it, and that never came. It never happened.

. . . I think the issues were for the Spanish and not me as a black man.

J.A. at 639–41. Hogan and teachers' aide Shereece Cooks, also African–American, were approached at different times by Latino employees about the Union, but they neither received any Union literature nor were they asked to sign authorization cards. Overton testified that she was never approached by a Union organizer or supporter.[4] By mid-fall, Marshall and Douglas stopped attending Union meetings. After the election, when a Union organizer called Douglas and invited her to a victory party, it was, in her view, a day late and a dollar short; Douglas refused to attend. J.A. at 621–22.

*The Press Event*

Workplace tensions skyrocketed when, on September 20, 1996, a television station came to Bryant Street and interviewed Latina employees about the language issue during the 12:30 lunch hour. According to a *San Francisco Examiner* article that featured the same interviews, the employees accused the management at FSA, and Storey in particular, of preventing them from speaking Spanish on the job through harassment and intimidation. J.A. at 773. Assistant teacher Reyna Ferreira was quoted as saying, " 'Whenever [Vivian Storey, the site supervisor] or the other superiors hear us speak Spanish, they come up and say "English, English, English." ' " *Id.* Perez was also quoted: " 'Our supervisors look at us like we're bad, like we're criminals because we speak Spanish.' . . . 'Vivian says to us, "You are in America. You have to learn En-

glish." ' " *Id.* No African–American employees or managers from the Bryant Street site were interviewed, although Shereece Cooks testified that she saw the Latina employees ask Art Marshall if he would go on camera. J.A. at 577–78.

The identity of the organizer of this press event was disputed during the hearing, and FSA argues here that the Union sponsored it. Garcia denied this and testified that he thought a lawyer from La Raza had contacted the media. Garcia was present at the event but he did not speak on camera; witnesses saw him chatting with employees after they had been interviewed. Sandra Ramirez was under the impression that the other Latina employees at FSA had contacted the press.

After this publicity, African–American employees were livid and the racial divide widened. "[F]rom then on, they [African–American co-workers] changed their attitude towards us a lot and they didn't treat us the same, and . . . they looked at us badly," Lourdes Perez testified. J.A. at 491. Ann Douglas said that the Latina employees "stopped speaking, some of them. When I would walk [into her classroom] in the morning and say good morning, some of them would speak, some wouldn't, and I would go on one side of the room, on the other side with my kids . . . ." J.A. at 618. Marshall said that he feared physical violence would erupt. J.A. at 649. In October, Cooks, Overton and Douglas all complained to Storey that they felt they were being taunted by the Latina employees who continuously spoke only Spanish in their presence, an occurrence that became more frequent after the press interviews.

*The Radio Interview*

In November 1996, Garcia arranged an interview with himself, Ramirez and Perez at a Spanish-language radio station in San Francisco. The three talked, in Spanish, about the language policy problem at FSA. Perez said in the interview that "Even with the parents themselves who don't understand the language, English, we're told that we

---

**4.** Various witnesses acknowledged, however, that Garcia visited the Latina lunch hour, and not the later one attended by African–Americans,' be-

cause Storey and other supervisors usually ate during the later period.

have to talk to them in English even though they [ ] talk to us in Spanish...." J.A. at 779. Garcia explained that his Union was trying hard to organize the public sector because "there are many conditions similar to what Sandra and Lourdes are expressing here." J.A. at 792. He continued, "[W]e also found that there were other workers, non-Latinos who were also suffering from mistreatment and from, from low wages and exploitation that they were enduring. That is we came to find out that there were many more problems than about Spanish but the Spanish problem was one that stood out because of the magnitude of it." J.A. at 793. Ramirez and Perez played a tape of the interview during the lunch hour of the Latina employees, although there is no evidence that any African–American workers heard the broadcast. Jones testified that she heard someone utter the words, in English, "black monkey," but she did not know whether the words came from the tape or from Perez, who was in the room. The transcript from the interview does not contain those words in English or Spanish. J.A. at 774–95. Soon after, at Thanksgiving, the traditional school-wide potluck degenerated into two separate luncheons, one for African–Americans and one for Latinas.

*The Workplace Visits*

During the organizing period, Garcia and another Union organizer, Doris Mitchell,[5] occasionally came to the Bryant Street premises to talk to employees, usually during the 12:30 lunch hour. Storey testified that she saw Mitchell "six or seven times" on the premises, but Storey's only confrontation with Mitchell occurred in August 1996, when she came across Mitchell conversing with employees in the lunchroom. Storey opened the door and closed it, and thought she heard Mitchell shouting and laughing at her. This happened again, and Storey left. Mitchell left shortly thereafter. J.A. at 540–41. Later, in early December, Storey had an encounter with Garcia, who was in the lunchroom during the 12:30 period. Storey asked Garcia to leave, and he refused. J.A. at 544.

Storey left to go to her office to call the police, and Garcia "came up to the office and he said to me he had every right to, in a loud manner, to be there." *Id.* Garcia announced that he would stay until 1:30 and then depart—which he did. The police were never summoned and there were apparently no witnesses to the encounter in the office. J.A. at 545.

*The Vote*

On January 8, 1997, the day of the election, there was a pre-election meeting with the NLRB agent to discuss the rules for voting. Witnesses agreed that the Board agent did not establish a "no-electioneering" zone and did not issue rules governing the conduct of employees during the voting period. An FSA employee, Jaynie Lara, was appointed to read the voting "script" to the workers in each classroom and to escort employees from their classrooms or the office to the lunchroom, where votes were cast. At one point during the hour and a half voting period, according to Lara, she told an on-call cook, Arturo Martinez, to sit in a chair outside the lunchroom, which was off the main hallway, and wait his turn to vote. For approximately 20 minutes, Martinez spoke to the voters who, one-by-one, entered and exited the lunchroom. Lara estimated the number of voters whom Martinez addressed as 10. Martinez told the employees in Spanish to "stick together" and "vote for the union," according to Lara, and also asked them how they had voted. J.A. at 434. Lara also recalled that three employees stood clustered in the door of Room 7/9 for about half an hour during the voting and made similar comments to voters; two employees behaved similarly in the doorway of Room 5 for about 20 minutes. It appears from the record that one of these rooms is across the hall from the lunchroom, and the other diagonal from it. Also, after Lara had read her script to the voters in Room 7/9 and Room 5, the supervising teacher in each room—Ana Hernandez and Esperanza Reveles, respectively—told the voters to make sure they voted for the union.

---

**5.** Mitchell is African–American and ran the first few Union meetings in the summer of 1996, until Garcia took over.

## II. DISCUSSION

■ We will affirm the Board's decision to order collective bargaining in the face of objections to the Union's representation if the decision is reasonable and if the Board's underlying findings of fact are supported by substantial evidence on the record as a whole. *See E.N. Bisso & Son v. NLRB,* 84 F.3d 1443, 1445 (D.C.Cir.1996). The Board must determine whether the challenged conduct tended to interfere with employees' free exercise of the franchise. *See Amalgamated Clothing & Textile Workers Union v. NLRB,* 736 F.2d 1559, 1562 (D.C.Cir.1984). This is a fact-intensive determination especially suited for Board review. *See id.* ("important in counseling deference to Board decisions ... is the fact that the Board's particular expertise qualifies it—rather than the courts—to decide whether to call for a rerun election"). A hearing officer "is '[ ] far better situated than are we to draw conclusions about a matter as ephemeral as the emotional climate of the [workplace] at the time of the election.'" *E.N. Bisso & Son,* 84 F.3d at 1444 (citation omitted). As a general matter, the burden is on the party seeking to overturn a Board-conducted representation election to establish that the election was not fairly conducted. *See Amalgamated Clothing Workers of America v. NLRB,* 424 F.2d 818, 827 (D.C.Cir.1970) (citing *Southwestern Portland Cement Co. v. NLRB,* 407 F.2d 131, 134 (5th Cir.1969)). A court will overturn the Board's decision to certify a bargaining unit only where the activities of union supporters created "'an atmosphere of fear and coercion which made a free and fair election impossible.'" *Amalgamated Clothing & Textile Workers Union,* 736 F.2d at 1562 (quoting *Daylight Grocery Co. v. NLRB,* 678 F.2d 905, 909 (11th Cir.1982)).

### A. Racial Appeals During Election Campaign

■ FSA objected after the election that "[t]he union and its supporters and agents conducted a campaign and engaged in tactics and conduct designed to pit Latino workers against African–American and other non-Latino workers, thereby basing their campaign on racial and ethnic prejudice and discrimina-

tion," and also that "[b]y ... appeals to racial and ethnic prejudice, the union unlawfully coerced, intimidated and interfered with the rights of eligible voters, and destroyed the laboratory conditions necessary for a valid election." J.A. at 44 (letter to NLRB, January 15, 1997). The hearing officer rejected this objection, we think reasonably.

■ We begin with the law that governs the use of race-based messages in union campaigns. The principle that the party challenging the election bears the burden of proving its invalidity gives way if the party that prevailed in the election used racial propaganda in an irrelevant and inflammatory manner. If the prevailing party inflamed racial prejudice to garner pro- or anti-union support, then it must prove that its race-laden statements were truthful and germane to the unionization effort. The Board has articulated the perimeters of racially charged but permissible campaign statements and messages:

> ... [A] relevant campaign statement is [not] to be condemned because it may have racial overtones.... We would be less than realistic if we did not recognize that such statements, even when moderate and truthful, do in fact cater to racial prejudice. Yet we believe that they must be tolerated because they are true and because they pertain to a subject concerning which employees are entitled to have knowledge....
>
> So long, therefore, as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him.

*Sewell Mfg. Co.,* 138 N.L.R.B. 66, 71–72, 1962 WL 16079 (1962) (footnote omitted) (emphasis in original).

■ Applying *Sewell,* we look first to whether the Union deliberately drove a wedge between African–American and Latina co-workers by racial baiting—namely, by assailing the center's alleged language policy in a way that was inflammatory and irrelevant to the campaign and by failing to ensure the inclusion of African–Americans during the membership drive.[6]  Our sister circuits have approached this task by examining the tenor and relevance of the union's race-based message as well as the degree to which the message formed the "core" of the unionization drive.  *See, e.g., M&M Supermarkets, Inc. v. NLRB,* 818 F.2d 1567 (11th Cir.1987); *NLRB v. Utell Int'l, Inc.,* 750 F.2d 177 (2d Cir.1984); *NLRB v. Silverman's Men's Wear, Inc.,* 656 F.2d 53 (3d Cir.1981); *Peerless of America, Inc. v. NLRB,* 576 F.2d 119 (7th Cir.1978); *NLRB v. Bancroft Mfg. Co.,* 516 F.2d 436 (5th Cir.1975).  The more outrageous and inflammatory the statement, the less important the question whether it formed the "core" of the campaign, and the more difficult it becomes for its sponsor to prove its relevance and truth.  For example, in *Silverman's Men's Wear,* the Third Circuit held that the NLRB erred in not holding a hearing based on evidence proffered by the employer that a union official called a company official a "stingy Jew" in front of 20 employees shortly before the election.  656 F.2d at 57–58.  Although the statement stood alone and did not comprise a core campaign issue, the court found it to be so inflammatory that the "Union clearly could not have met" its burden of proving it was actually

relevant.  *Id.* at 58;  *see also M&M Supermarkets,* 818 F.2d at 1573–74 (one employee's reference to employers as "those damned Jews" at a single meeting enough to invalidate election); *cf. Utell Int'l,* 750 F.2d at 179 ("the *Sewell* test for truth and relevancy . . . is applicable only to inflammatory racial appeals").[7]

■ It is permissible for a union to promulgate a message that is wholly relevant and accurate, even though it implicates race.  A "union's claim that management discriminated on the basis of race, sex and national origin [is] not an inflammatory racial appeal." *State Bank of India,* 808 F.2d at 542; *cf. Utell Int'l,* 750 F.2d at 178–79.  The hearing officer in this case reasonably concluded that the Union's and employees' statements and actions regarding the language issue amounted to no more than a claim of discrimination.  Lourdes Perez' notation on the June 26 meeting form that Latina employees had been forbidden from speaking Spanish, the subsequent skirmishes over language issues between Latina employees and their supervisors, Latina employees' complaints to the news media that their supervisors harangued them to speak English, and the similar comments made during the radio interview do not appear to be empty claims aimed at provoking racial hatred.  We reach this conclusion without deciding whether these acts were attributable to the Union.  *See NLRB v. Herbert Halperin Distributing Corp.,* 826 F.2d 287, 291 (4th Cir.1987) (question is

6. The parties do not dispute that the Union's alleged targeting of members based on race should be considered under the *Sewell* analysis.  We note and adopt the Fifth Circuit's view on this issue:

> That the Union's appeal in this case was predominately to [one race] does not in itself tell us either that race was the theme of the campaign, or that the Union's appeal was inflammatory.  Rather, we think the racial one-sidedness of the Union's effort should be given the analytical effect in our review of intensifying the scrutiny with which we regard the incidents of the Union's "appeal to race hatred" cited by the Company.

*NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 926 (5th Cir.1976) (footnote omitted).

7. The Fifth Circuit appears to have adopted the approach that if a racial message forms *either* the core of the campaign *or* is inflammatory, the

burden shifts to the sponsor to prove that the statement was truthful and relevant to the campaign.  *See Sumter Plywood, supra* note 6, at 925 ("the reversal of burden of persuasion occurs if the racial remarks 'form the core or theme of the campaign,' or if the statements are racially inflammatory") (citation omitted); *Bancroft Mfg.,* 516 F.2d at 442–43.  Instead, we adopt the Second and Seventh Circuits' sliding scale approach, in which we assess together the degree of the message's relevance and importance.  *See Utell Int'l,* 750 F.2d at 179; *State Bank of India v. NLRB,* 808 F.2d 526, 541 (7th Cir.1986).  Otherwise, the promulgation of a "core" yet tempered and relevant race-based message would unnecessarily require further and redundant examination.

whether the "amount of association between the union and the [employees] is significant enough to justify charging the union with the conduct") (quotation omitted). By so doing, we subject the Union to a standard more stringent than that other courts have required when examining the actions of third parties: Where the Union sponsored the race-based message, the election must be set aside if the message was inflammatory and inspired an atmosphere of fear and coercion. *Cf. id.* at 290 (election set aside because of third-party conduct only if election was held in "a general atmosphere of confusion, violence, and threats of violence...") (citation omitted). Even assuming *arguendo* that the Union was responsible for the turmoil over the alleged existence of a language policy, we are unable to identify any statements or actions it made that were so inflammatory and irrelevant that the Board's contrary conclusion must be overturned. The comments reported in the *San Francisco Examiner* article and the statements made in the radio interview appear to us, as to the Board, to be reasonably accurate descriptions of the situation as Garcia and the Latina employees perceived it to be and not calculated to spark racial prejudice.[8] Written records—namely, from the June 5 staff meeting in Room 2— and the testimony of Vivian Storey as to her encounters with Latina employees may tend to support FSA's contention that there was no official "English-only" policy. However, the hearing officer found that employees' testimony to the contrary was credible, and it is not necessary to determine whether there actually existed an established English-only policy; the relevant point is that the Board could reasonably find, in this conflicted record, that the Latina employees' allegations that one existed were not reckless, capricious, or otherwise emblematic of an intent to invoke racial hatred. The subsequent conflict

over the use of Spanish in the presence of non-Spanish speaking employees, the complaints by African–American workers about feeling excluded among Spanish speakers, and the racial bifurcation of the Thanksgiving dinner illustrate the racial tension at FSA but do not necessarily lead to the conclusion that the Union was igniting prejudice. The hearing officer did not credit Jones' testimony that the words "black monkey" were actually uttered, J.A. at 67, and there is no reason in the record for us to disturb this finding. *See E.N. Bisso & Son,* 84 F.3d at 1444–45 (hearing officer is "uniquely well-placed to draw conclusions about credibility") (citation and quotation omitted).

We stress that we do not endorse what appears from most accounts to have been a palpable disinterest by the Union in non-Latino workers and the resulting *de facto* segregation of employees during the organizing drive. *See Sumter Plywood,* 535 F.2d at 926 ("This concentration on voters of one race, to the relative exclusion of voters of the other, is disturbing and is not to be condoned"). Yet even considering this lamentable behavior towards African–American workers, we nonetheless agree with the Board that there was nothing in this tendentious campaign that made "impossible a sober, informed exercise of the franchise." *Sewell Mfg.,* 138 N.L.R.B. at 71.

B. *Supervisory Taint in the Election Process*

■ FSA objected that the "petition and election process were unlawfully tainted by the inclusion of statutory supervisors," J.A. at 44. The threshold question in a supervisory taint claim is, of course, whether the accused parties were in fact "supervisors" under the NLRA. *See Westwood One*

---

8. FSA asserts that Garcia made inflammatory misrepresentations to the Latina employees by telling them that they had an "absolute right" to speak Spanish on the job. Petitioner's (Pet.) Br. at 23. Garcia himself said he told the employees that he thought the policy, if it existed, was "illegal or [wrong]," and Perez testified that Garcia told her that she had a "right" to speak Spanish. J.A. at 737–38; 719–20. FSA argues that this statement was wrong in light of *Garcia v. Spun Steak,* 998 F.2d 1480 (9th Cir.1993)

(holding that, in the circumstances presented in that case, an English-only policy in the workplace could not constitute a violation of Title VII), but this legal conclusion, alone, is not sufficient to render Garcia's statements prejudicial enough to invalidate the election. *See Utell,* 750 F.2d at 179–80 (in case of alleged misrepresentation, Board is to consider, *inter alia,* other party's opportunity to correct the misrepresentations before invalidating election).

*Broadcasting Servs., Inc.*, 323 NLRB No. 175, 1997 WL 331860 (1997), *enforced* 159 F.3d 1352, 1998 WL 516986 (3d Cir.1998). This issue could have been litigated at FSA's behest during the representation stage of these proceedings. In fact, FSA initially challenged the presence of supervising teachers in the bargaining unit. *See* 29 U.S.C. § 152(3) (excluding from its definition of covered "employee ... any individual employed as a supervisor"). After a hearing on the matter, the Regional Director found that the supervising teachers were not statutory supervisors under the NLRA, but on appeal the Board amended the Regional Director's decision to permit the teachers to vote subject to challenge. *See* J.A. at 101 n.3 (Decision and Certification of Representative, October 17, 1997). At the pre-election conference, the Employer's representative explicitly withdrew the challenge to the eligibility of the supervising teachers. *See id.*

In issuing its Certificate of Representative, the Board denied FSA's post-election objection based on supervisory taint because it was "in the nature of postelection challenges which the Board has held that it will not entertain." J.A. at 101. The Board has long refused to hear challenges to votes brought for the first time after an election, as well as objections that are merely reformulated challenges to votes. *See, e.g., NLRB v. A.J. Tower Co.*, 329 U.S. 324, 332, 67 S.Ct. 324, 91 L.Ed. 322 (1946); *Prior Aviation Serv., Inc.*, 220 N.L.R.B. 460, 461 n. 3, 1975 WL 5980 (1975) (listing cases). The difference between objections and challenges is that "[o]bjections relate to the working of the election mechanism and to the process of counting the ballots accurately and fairly. Challenges, on the other hand, concern the eligibility of prospective voters." *A.J. Tower Co.*, 329 U.S. at 334, 67 S.Ct. 324. The ban on post-election challenges is traditionally employed when one party files a post-election "objection" that directly challenges the eligibility of

a voter that was not raised previously. *See Prior Aviation Serv., Inc., supra,* at 460 (ban on post-election challenges applied to objection that alleged employee "was an ineligible voter by reason of his supervisory status"). Otherwise, as the Supreme Court has observed, losing parties would be able to lodge attacks on elections *ad infinitum,* "delay[ing] the finality and statutory effect of the election results." *A.J. Tower Co.*, 329 U.S. at 332, 67 S.Ct. 324.

█ The Board in this case not unreasonably relied on the ban on post-election challenges to bar FSA's attempt to revisit the issue of the teachers' supervisory status after the election, since FSA had explicitly abandoned that same challenge before the election. But it is not clear that the ban will take it the whole way, because, as noted above, it has traditionally been limited to challenges to votes or the constituency of the bargaining unit. However, the Board does allude briefly to a collateral estoppel argument which we find more compelling, that is, that a party such as FSA here cannot specifically withdraw its challenge to certain voters as supervisors and later allege that they are indeed supervisors whose participation in the disputed election has "tainted" it. *See* J.A. at 101 n.3.

█ Thus, since FSA withdrew its challenge to the supervisory status of the teachers pre-election, it was subsequently estopped from litigating the issue post-election, and as the Board found in its Decision and Order in the instant section 8(a)(5) refusal-to-bargain proceeding, *see* J.A. at 135, cannot now reopen the record of the representation proceeding to attempt again to litigate this issue. Board rules bar reopening the record to litigate issues in related unfair labor practice proceedings that the Board could have reviewed in the representation proceeding. *See* 29 C.F.R. § 102.67(f).[9] And FSA "fail[ed] to request review" of whether a supervising teacher is a statutory supervisor

---

9. Section 102.67(f) states: "The parties may, at any time, waive their right to request review. Failure to request review shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding."

prior to the election, thereby precluding it from "relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding." *Id.* We have, it is true, previously held that a union is not barred under this rule from relitigating representation issues when it brings unfair labor practice charges under sections 8(a)(1) and 8(a)(3) [10] of the NLRA because such charges do not constitute a *"related* subsequent unfair labor practice proceeding" (emphasis added). *See Thomas–Davis Med. Ctrs. v. NLRB,* 157 F.3d 909, 913 (D.C.Cir.1998); *Clark & Wilkins Indus., Inc. v. NLRB,* 887 F.2d 308, 316 (D.C.Cir.1989). Similarly, an employer in a subsequent section 8(a)(1) or 8(a)(3) proceeding is not barred from raising a defense that was or could have been litigated in the representation proceeding. *See Intermountain Rural Elec. Ass'n v. NLRB,* 732 F.2d 754, 760–61 (10th Cir.1984) (permitting confidential employee defense). By contrast, a section 8(a)(5) case based on an employer's technical refusal to bargain in order to obtain review of the representation proceeding is necessarily a "related subsequent unfair labor practice proceeding." *See Amalgamated Clothing Workers of America, AFL–CIO v. NLRB,* 365 F.2d 898, 903 (D.C.Cir.1966) (a company's appeal to the court in a refusal to bargain proceeding must be "based on the record made at the earlier representation hearing"); *see also NLRB v. Hydro Conduit Corp.,* 813 F.2d 1002, 1005 (9th Cir.1987); *Intermountain Rural Elec.,* 732 F.2d at 760–61; *Rock Hill Tel. Co. v. NLRB,* 605 F.2d 139, 143 (4th Cir.1979); *Heights Funeral Home, Inc. v. NLRB,* 385 F.2d 879, 881–82 (5th Cir.1967). *Accord Hyatt Hotels, Inc. v. International Union of Operating Engineers,* 256 N.L.R.B. 1099, 1981 WL 20552 (1981) (in refusal to bargain proceeding, no relitigation of supervisory status of pro-union employee who was alleged by employer to have interfered with the election). Since the record shows that FSA

waived its right to request review of the supervisory status of the supervising teachers during the representation proceeding, relitigation of the supervisory taint issue is precluded.

### C. *Unlawful Electioneering*

■ Another of FSA's objections was that "Union supporters and agents engaged in unlawful electioneering, coercion, intimidation and interference in the vicinity of the polling place during the election." J.A. at 45. We believe that the Board reasonably concluded that the electioneering at Bryant Street on the day of the election was within the permissible range.

■ The Board has repeatedly declined to impose a zero-tolerance rule on voting day electioneering. *See Overnite Transp. Co. v. NLRB,* 140 F.3d 259, 269 (D.C.Cir.1998) (citing *Boston Insulated Wire & Cable Co.,* 259 N.L.R.B. 1118, 1118, 1982 WL 24165 (1982), *enforced,* 703 F.2d 876 (5th Cir.1983)); *see also NLRB v. Duriron Co.,* 978 F.2d 254, 256 (6th Cir.1992) (" 'Laboratory conditions' are not always achieved in practice, and elections are not automatically voided whenever they fall short of perfection."). "Instead, the Board considers a range of factors and circumstances in determining whether electioneering activity is sufficient to justify overturning an election." *Overnite Transp.,* 140 F.3d at 269. The Board has considerable discretion to determine whether the circumstances of an election have enabled employees to exercise free choice in casting their ballots. *Id.* When "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots" take place, *Milchem, Inc.,* 170 N.L.R.B. 362, 362 (1968), the Board will order a new election. *Cf. NLRB v. Del Rey Tortilleria, Inc.,* 823 F.2d 1135 (7th Cir.1987) (*Milchem* does not require new election when union repre-

---

**10.** These sections provide, in relevant part:

(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

29 U.S.C. § 158(a).

sentative spoke with employees lined up on sidewalk *before* polls open).

But where, as here, the electioneering did not involve union agents, the Board will overturn the election "only if the electioneering 'substantially impaired the exercise of free choice.'" *Overnite Transp.*, 140 F.3d at 270 (citing *Del Rey Tortilleria*, 823 F.2d at 1140 (citation omitted)).

> The Board generally considers the nature and extent of the electioneering, whether it happened within a designated "no electioneering" area, whether it was contrary to the instructions of the Board's election agent, whether a party to the election objected to it, and whether a party to the election engaged in it.

*Id.* at 270. In this case, the Board agent did not designate a "no-electioneering zone" outside of the lunchroom. FSA urges us to consider *Pepsi-Cola Bottling Co. of Petersburg, Inc. v. Local Lodge 10*, 291 N.L.R.B. 578, 1988 WL 214192 (1988), in which the Board found that unlawful electioneering had occurred within a *prima facie* "no-electioneering" zone even though none had been established before the election. In *Pepsi-Cola Bottling*, however, the Board determined that this "no electioneering" zone existed where employees waited in line to vote. By contrast, as the Board correctly found in the instant case, employees did not wait outside the lunchroom to vote. There was thus no area where employees stood as a captive audience, waiting to cast their ballots, that should have been considered off-limits as a matter of law. Applying the other factors, the employees did not act contrary to any of the instructions of a Board agent, *see Star Expansion Indus. Corp.*, 170 N.L.R.B. 364, 1968 WL 18777 (1968) (agent of union asked to leave no-electioneering zone three times). Nor does FSA contend that it objected to the activities of the Union's supporters at the time employees entered or exited the voting place.

Finally, the general "nature and extent" of the electioneering in this case did not substantially impair employees' ability to exercise free will at the ballot box. The Board reasonably found that the combined effect of the relatively brief interludes of electioneering by teachers as voters exited and entered classrooms 5 and 7/9, as well as Martinez' occasional comments as he sat outside the lunchroom waiting to vote, was not coercive. *Compare Claussen Baking Co.*, 134 N.L.R.B. 111, 1961 WL 15136 (1961) (prolonged antiunion discussion between a leadman and several new employees within 15 feet of the poll in no-electioneering zone, with a plant manager standing nearby, and which was stopped only by intervention of the Board agent, required that election be set aside), *with Duriron*, 978 F.2d at 258 (no new election where pro-union employees gathered in hallways for an hour during voting period within 15 to 20 feet of polling place and discussed pro-union position with employees in their work areas); *Boston Insulated Wire & Cable Sys. v. NLRB*, 703 F.2d at 880–81 (no new election where union agents leafletted outside doors as employees entered building and proceeded down corridor to vote); *and Southeastern Mills, Inc. v. Bakery & Confectionery Workers'*, 227 N.L.R.B. 57, 1976 WL 7617 (1976) (no new election where pro-union employee sat for 20 minutes near employees waiting in line to vote, loudly predicted their votes and stated that he hoped they had voted right). That the classrooms were located just across the hall from the voting area is acknowledgedly troubling, because it allowed at least some voters to be subjected to pro-union campaigning up to the last moments before they cast their ballots. Similarly, the Union supporters' inquiries to voters leaving the polling place as to how they cast their ballots is not paradigmatic of sterile "laboratory conditions." However, ultimately, we defer to the Board's reasoned conclusion that neither of these occurrences tend to intimidate voters in light of the fact that employees were not standing in line to vote as a captive audience to the union supporters' comments, there was no "no electioneering" zone, and further, that no evidence was adduced that voters were forced to contend with a constant barrage, as opposed to an intermittent sprinkling, of pro-union advocacy.

### D. *Union Agents' Invasion of the Workplace*

FSA also alleged that "Union agents repeatedly invaded the employer's

workplace during working times to engage in electioneering with employees, deliberately creating hostile confrontations with management and refusing to leave when lawfully asked to do [sic]." J.A. at 45. This objection must also fail. When a party to an election is alleged to have engaged in conduct requiring the overturning of the election results, the Board, and we, employ a standard similar to the one used with allegations of improper electioneering. "[T]he Board judges the conduct by assessing whether it 'reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election.'" *NLRB v. Earle Industries, Inc.*, 999 F.2d 1268, 1272 (8th Cir.1993) (quoting *Baja's Place, Inc. v. Hotel, Motel, Restaurant Employees Union*, 268 N.L.R.B. 868, 868, 1984 WL 36040 (1984)). The factors the Board considers include: the number of incidents of misconduct; the severity of the incidents and whether they were likely to cause fear among the employees in the bargaining unit; and the proximity of the misconduct to the election date. *See id.*; *see also Avis Rent–A–Car Sys., Inc. v. Local Lodge 724*, 280 N.L.R.B. 580, 1986 WL 53941 (1986).

Here, as the Board correctly found, Mitchell and Garcia made several visits to the Bryant Street site but only two alleged "incidents" of misconduct occurred. Site Supervisor Storey's brief run-in with Mitchell could hardly be described as likely to induce fear among employees; it was not confrontational and there is no evidence that Mitchell was even asked to leave. Although there were witnesses to Storey's initial encounter with Garcia, that encounter consisted only of Garcia's telling Mitchell that he had a right to be on the premises. The evidence does not reflect that there were any witnesses to the subsequent, slightly more rancorous encounter in the office. Even so, whatever employee angst may have resulted from these two encounters surely dissipated by election day—one incident occurred five months and the other one month before the election. *Cf. Wilkinson Mfg. Co. v. NLRB*, 456 F.2d 298, 303–04 (8th Cir.1972) (two month interval before election not enough if the incident had been a constant topic of discussion and concern); *Station Operators*, 307 N.L.R.B. 263, 1992 WL 90690 (1992) (fact that incident

occurred two weeks before election supported finding that pre-election misconduct did not taint election). This case is thus distinguishable from *Phillips Chrysler Plymouth, Inc.*, 304 N.L.R.B. 16, 1991 WL 160361 (1991), where union agents engaged in a shouting match with the company's president in front of all 10 members of the bargaining unit an hour before the polls opened and refused to leave even after the company called the police. These two run-ins did not rise to the level of interfering with employees' free and uncoerced choice in the election.

### E. Compliance with the LMRDA Reporting Requirement

Finally, FSA objected that the Union is not a *bona fide* labor organization under the NLRA for purposes of representing employees because it "unlawfully failed and refused to file any of the financial and other reports required of all private sector unions." J.A. at 44. FSA asserted that "the union's refusal to file was a violation of employees' Section 7 rights to know about union finances and other matters in order to make an informed election choice. . . ." *Id.* The LMRDA requires labor unions to file certain financial disclosure reports. *See* 29 U.S.C. §§ 431(a), 431(b), 432 & 435; *see generally Brennan v. Local Union 10*, 527 F.2d 588 (9th Cir.1975). Section 2(5) of the NLRA, which makes no reference to these reporting requirements, merely defines a "labor organization" as including "any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). In the course of pre-election proceedings in the instant case, the Regional Director concluded that compliance with the LMRDA was not relevant to the union's status as a labor organization under the NLRA. *See* J.A. at 21–22. The hearing officer, and the Board in turn, adopted this conclusion. *Desert Palace, Inc. v. Local 711 Union of Gaming*, 194 N.L.R.B. 818, 818 n. 5, 1972 WL 4193 (1972) ("The NLRB is not entrusted with the administration of the [LMRDA]. An organization's

possible failure to comply with that statute should be litigated in the appropriate forum under that act, and not by the indirect and potential duplicative means of our consideration...."); *see also S.H. Kress & Co. v. Poor People's Union of America,* 212 N.L.R.B. 132, 1974 WL 5240 (1974). In a case in which a company argued that a labor union should not be entitled to an order directing an election because of, *inter alia,* numerous internal problems and possible mob influence, the Board concluded:

> The allegations made by [the company] ... concern improper or corrupt practices in the administration of *internal* union affairs. In ... the [LMRDA], Congress expressly dealt with such matters. It is particularly significant that the remedies provided in the LMRDA were given to individual employees directly, and to the public through the intervention of [other departments]. The theory underlying this type of remedial legislation is not to "illegalize" the organization itself, but to afford protection to all parties concerned by creating specific Federal rights and remedies whereby the activities of the organization and its officers and agents are regulated and subjected to judicial review in vindication of those rights. Had Congress de-

sired to strike directly at the organization itself, Congress would have said so.

*Alto Plastics Mfg. Corp.,* 136 N.L.R.B. 850, 853, 1962 WL 16493 (1962). In oral argument, FSA attempted to distinguish *Alto Plastics* from this case because the company in *Alto Plastics* had sought directly to invoke the Board's jurisdiction to hear a complaint brought under the LMRDA, whereas here, FSA is not asking the Board to adjudicate the LMRDA issue. However, this analysis ignores the basic point of *Alto Glass,* which is applicable here: the LMRDA is simply "not relevant or material to the issue of [the Union's] status as a labor organization," at least in the circumstances of this case. *Id.* at 851.[11]

## CONCLUSION

For the reasons stated above, we deny FSA's petition for review and grant the Board's petition for enforcement of its Decision and Order.

*So ordered.*

---

11. In oral argument and in the Reply brief, counsel for FSA contended that the company's argument is not premised on compliance with the NLRA's definition of a "labor organization," but rather on the theory that a violation of employees' section 7 rights under the NLRA is itself a form of election-related misconduct. However, FSA has failed to point to any evidence in the record that would show the alleged section 7 violation "reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election." *Baja's Place,* 268 N.L.R.B. at 868. We therefore reject this theory as well.