United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 4, 1998 Decided January 15, 1999 

 No. 98-1204

 Family Service Agency San Francisco, 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 Service Employees International Union, 

 Local 790, AFL-CIO, 

 Intervenor

 On Petition for Review and Cross-Application for 
 Enforcement of an Order of the National 
 Labor Relations Board

 Paul B. Johnson argued the cause and filed the briefs for 
petitioner.


 Sharon I. Block, Attorney, National Labor Relations 
Board, argued the cause for respondent. With her on the 
brief were Linda Sher, Associate General Counsel, John D. 
Burgoyne, Acting Deputy Associate General Counsel, and 
Fred L. Cornnell, Supervisory Attorney.

 Before: Wald, Silberman and Sentelle, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Wald, Circuit Judge: In June 1996, the Service Employees 
International Union Local 790, AFL-CIO ("Union") began a 
campaign to unionize a daycare site operated by Family 
Service Agency San Francisco ("FSA"), a private agency 
hired by state and local authorities to provide child care to 
underprivileged children. The Union set about organizing 
the supervising teachers, who were in charge of six class-
rooms at the site, as well as the assistant teachers, teachers' 
aides, and the facility's office and support workers. In Octo-
ber 1996, the Union filed a petition with the National Labor 
Relations Board ("NLRB" or "Board") seeking a representa-
tion election among these employees. FSA objected to the 
proposed bargaining unit on the ground that supervising 
teachers were statutory supervisors and so disqualified under 
the National Labor Relations Act ("NLRA" or "the Act") 
from inclusion. After a hearing, the Board's Regional Di-
rector found that they were not supervisors and ordered an 
election in the petitioned-for unit. On appeal, the Board 
amended this ruling to permit the supervising teachers to 
vote subject to challenge. See Joint Appendix ("J.A.") at 42 
(Order of Dec. 19, 1996).

 The election was held on January 8, 1997. The union won 
25 to 12, with one challenged ballot. At the pre-election 
conference, FSA did not challenge the ballots cast by super-
vising teachers. After the election, it filed the following 
objections: (1) the Union destroyed the laboratory conditions 
of the election by improperly appealing to racial prejudice 
during the election campaign; (2) the election was tainted by 
the involvement of supervisory teachers in the election pro-
cess; (3) Union supporters engaged in improper electioneer-
ing during the voting; (4) the Union engaged in misconduct 

when its agents improperly invaded the workplace; and (5) 
the election was invalid because the Union failed to file 
reports required by the Labor-Management Reporting and 
Disclosure Act ("LMRDA"), 29 U.S.C. ss 431(a), 431(b), 432 
& 435.1 The Board's hearing officer, after four days of 
testimony, issued a report which recommended that all of the 
objections be overruled. FSA filed exceptions with the 
Board, but the Board rejected them and instead adopted the 
hearing officer's findings and conclusions. The Decision and 
Certificate of Representative issued on October 17, 1997. 
FSA refused to bargain with the Union on the ground--the 
same raised in its objections--that the election was not 
conducted lawfully. J.A. at 107 (Answer to Complaint). The 
Union filed a complaint with the Board, charging that FSA 
violated sections 8(a)(1) and (5) of the National Labor Rela-
tions Act ("NLRA" or "the Act"), 29 U.S.C. s 158(a)(1) and 
(5), and the NLRB General Counsel subsequently brought an 
unfair labor practice charge against the agency. The Board 
granted the NLRB's motion for summary judgment, and FSA 
asks that we deny enforcement of the Board's order to 
bargain collectively.2 The NLRB cross-petitions for enforce-
ment.

 We hold that FSA is estopped from attempting to litigate 
the question whether the election was tainted by the involve-
ment of supervisors. FSA waived its right to a ruling on 
whether the supervising teachers are statutory supervisors 

__________
 1 FSA also objected that the Union improperly threatened em-
ployees, made promises of monetary reward and made misrepresen-
tations during the campaign. The Board's rejection of these objec-
tions was not raised here.

 2 Certification by the Board is not an "order" subject to judicial 
review, see American Fed'n of Labor v. NLRB, 308 U.S. 401 (1940), 
so review of certification proceedings must await a final order by 
the Board in an unfair labor practice proceeding (often called a 
"technical refusal to bargain") under sections 10(e) and (f) of the 
NLRA, as amended, 29 U.S.C. ss 160(e) and (f). The record of the 
certification proceeding becomes part of the record for review in the 
unfair labor practice case pursuant to section 9(d), 29 U.S.C. 
s 159(d).

during the prior representation proceeding, and may not 
bring that issue before this court. We also find that the 
Board reasonably concluded that FSA's other objections 
lacked merit.

 I. Background

 Teachers and administrators work in close proximity at 
FSA's Bryant Street site, serving 160 children aged two 
weeks to three years old. Each classroom is staffed by a 
supervising teacher, an assistant teacher, and teachers' aides. 
When the Union began its organizing campaign in June 1996, 
racial discord already characterized relations between Afri-
can-American and Latina3 employees. The supervisor of the 
center, Vivian Storey, who is African-American, testified that 
at some point before the Union's arrival, a Latina co-worker 
told Storey that she could not socialize with her African-
American co-workers anymore because she had been ha-
rassed by another Latina. J.A. at 510. In addition, the 
employees took racially segregated lunch periods, with Latina 
workers eating from 12:30 to 1:30 and African-Americans 
from 1:30 to 2:30 p.m. J.A. at 552.

The Language Issue

 The pivotal issue that drove a wedge between Latina and 
African-American workers--the alleged presence of a policy 
limiting use of Spanish in the classroom and front office--
surfaced well before the unionization campaign. In early 
1996, there were a series of meetings among administrators 
in which the staff addressed, among other things, complaints 
about Sandra Ramirez, who worked in the center's front 
office and dealt with agency clients. J.A. at 751-58 (testimo-
ny of Claudette Darley, operations manager). At one such 
meeting, according to Darley, one of Ramirez' supervisors, 
Ramirez was instructed to speak English whenever she was 
in a group of people that included non-Spanish speakers. 

__________
 3 We use the term "Latina" to refer to employees whose first 
language is Spanish because the Spanish-speaking employees at 
issue in this case are all women.

J.A. at 767. Ramirez was told of an incident in which three 
African-American parents were standing in the office while 
the Latina staff conversed in Spanish, and Ramirez was 
warned that this could be considered insulting by non-
Spanish-speaking parents. Id.; see also J.A. at 797 (notes 
from 1/11/96 staff meeting).

 The language issue arose again on June 5, 1996, when a 
staff meeting was held among the teachers in Room 2. 
Among the teachers who attended were Phyllis Hogan, the 
African-American supervising teacher for the room; Edith 
Ruiz, a Latina teachers' aide; and Johnny Overton, an Afri-
can-American substitute teachers' aide. According to testi-
mony and contemporaneous hand-written notes from the 
meeting (it is not clear from the record who served as note-
taker) a parent had complained about the Latina staff's 
speaking Spanish to her son. The notes from the meeting set 
forth the following: "It is appropriate to speak Spanish to 
children whose primary language is Spanish, as long as it is 
in accordance with their parents' wishes. It is appropriate to 
speak Spanish to Spanish-speaking parents in order to convey 
information or explain things more clearly." J.A. at 796 
(emphasis in original). "If a non-Spanish-speaking parent or 
staff member is nearby when Spanish is being spoken, a staff 
member will attempt to give a short explanation in English of 
what is being discussed so they don't feel unwelcome or 
uncomfortable; Ex: 'Hi ___. I was just explaining this 
memo to ___. I'll be right with you.' " Id.

 Some time later in June, according to Ruiz, Ruiz was 
speaking Spanish to a parent and Hogan came into the room. 
Hogan "touched me on the shoulder and she told me, 'Re-
member.' And then she told me ... that we were going to 
have a short meeting," Ruiz testified. J.A. at 706. Once the 
children went down for their naps, Hogan asked Ruiz wheth-
er she remembered that she should not speak Spanish, ac-
cording to Ruiz, and Ruiz asked for a written policy regarding 
the language issue. J.A. at 706-07. This was followed by a 
tense interaction between Storey, who subsequently inter-
vened, and Ruiz; Ruiz testified that Storey told her she was 
in America and should speak English, J.A. at 706, but Storey 


denied this and recalled that she told Ruiz each employee 
needed to be sensitive to other cultures, J.A. at 527. "My 
words was to her that there is a whole lot of rules and 
regulations that I do not like," Storey testified, "and I said if 
I could not follow the rules and stuff, then it was time for me 
to leave." Id.

 Also at the end of June, the teachers in Room 7/9 held a 
staff meeting at which they discussed the use of Spanish. 
Notes from this meeting reflect mounting tension over the 
issue. Marva Stephens, the African-American supervising 
teacher in the classroom at the time, indicated on the "Meet-
ing Outcome" form that "[t]o identify speech and language 
problems, staff will use English then Spanish to enhance 
receptive language skills, and to assist development by speak-
ing English." J.A. at 804. But Lourdes Perez, a Latina 
teachers' aide, wrote in Spanish her own version of what 
happened at the meeting on the "Meeting Outcome" form. 
Perez testified that her notation reads: " 'Today, June 26, our 
supervisor once again has forbidden us. She does not want 
us to talk Spanish in the rooms. And that she does not care 
what the Union' has said...." J.A. at 726. At the hearing, 
Storey denied directing Stephens to implement an "English-
only" language policy. J.A. at 570.

The Organizing Campaign

 In their testimony Storey and other higher-ranking em-
ployees all unequivocally denied that FSA ever had an "En-
glish-only" language policy, but Latina employees felt that 
their supervisors were increasing pressure on them to stop 
speaking Spanish. When the Union began to hold meetings 
among employees in the prospective bargaining unit in the 
summer of 1996, J.A. at 512, the language issue was one of 
the first workplace problems that the Latina employees men-
tioned to Union organizer Ruben Garcia. J.A. at 719 (testi-
mony of Lourdes Perez); J.A. at 735 (testimony of Ruben 
Garcia). Garcia testified that he referred the employees to 
La Raza Central Legal, a public interest law organization 
which specializes in Latino issues, in an effort to extricate the 


union from the language issue because it "in my experience [ ] 
shows to be a divisive issue." J.A. at 735. Garcia also 
testified that the Union never distributed literature address-
ing the language issue. J.A. at 739. Not surprisingly, the 
union drive was still racially divisive. Two African-American 
employees, Art Marshall, the cook at FSA, and Ann Douglas, 
a substitute teachers' aide, testified that they initially attend-
ed some Union meetings. As the campaign continued into 
the fall, however, Garcia conducted the meetings primarily in 
Spanish, with English translation. Marshall and Douglas 
thought that they were being denied a full understanding of 
what was said at the meetings, and Marshall, who had 
approached Garcia several times about his concerns that 
African-Americans had been left out of the organizing efforts, 
felt that the Union did not care about the concerns of 
African-American workers. Marshall said:

 ... I even told him [Garcia], hey man, ... some of the 
 blacks kind of like want to bow out of this because we 
 feel like our issues aren't being met and most of the 
 Chicano issues are.

 He said, well, we'll get with that, you know.... I even 
 told him how to go about bringing the blacks back into 
 the thing, but he kind of like ignored it, overlooked it 
 or--that's the way I look at it.

 ....

 I just said that I think we should, you know, we should 
 try to get together, you know, and keep blacks involved 
 in this, because I was still strongly for the Union and 
 then he kept saying, ... we'll deal with it, and that never 
 came. It never happened.

 ... I think the issues were for the Spanish and not me 
 as a black man.

J.A. at 639-41. Hogan and teachers' aide Shereece Cooks, 
also African-American, were approached at different times by 
Latino employees about the Union, but they neither received 
any Union literature nor were they asked to sign authoriza-
tion cards. Overton testified that she was never approached 

by a Union organizer or supporter.4 By mid-fall, Marshall 
and Douglas stopped attending Union meetings. After the 
election, when a Union organizer called Douglas and invited 
her to a victory party, it was, in her view, a day late and a 
dollar short; Douglas refused to attend. J.A. at 621-22.

The Press Event

 Workplace tensions skyrocketed when, on September 20, 
1996, a television station came to Bryant Street and inter-
viewed Latina employees about the language issue during the 
12:30 lunch hour. According to a San Francisco Examiner 
article that featured the same interviews, the employees 
accused the management at FSA, and Storey in particular, of 
preventing them from speaking Spanish on the job through 
harassment and intimidation. J.A. at 773. Assistant teacher 
Reyna Ferreira was quoted as saying, " 'Whenever [Vivian 
Storey, the site supervisor] or the other superiors hear us 
speak Spanish, they come up and say "English, English, 
English." ' " Id. Perez was also quoted: " 'Our supervisors 
look at us like we're bad, like we're criminals because we 
speak Spanish.' ... 'Vivian says to us, "You are in America. 
You have to learn English." ' " Id. No African-American 
employees or managers from the Bryant Street site were 
interviewed, although Shereece Cooks testified that she saw 
the Latina employees ask Art Marshall if he would go on 
camera. J.A. at 577-78.

 The identity of the organizer of this press event was 
disputed during the hearing, and FSA argues here that the 
Union sponsored it. Garcia denied this and testified that he 
thought a lawyer from La Raza had contacted the media. 
Garcia was present at the event but he did not speak on 
camera; witnesses saw him chatting with employees after 
they had been interviewed. Sandra Ramirez was under the 

__________
 4 Various witnesses acknowledged, however, that Garcia visited 
the Latina lunch hour, and not the later one attended by African-
Americans, because Storey and other supervisors usually ate during 
the later period.


impression that the other Latina employees at FSA had 
contacted the press.

 After this publicity, African-American employees were livid 
and the racial divide widened. "[F]rom then on, they [Afri-
can-American co-workers] changed their attitude towards us 
a lot and they didn't treat us the same, and ... they looked at 
us badly," Lourdes Perez testified. J.A. at 491. Ann Doug-
las said that the Latina employees "stopped speaking, some of 
them. When I would walk [into her classroom] in the morn-
ing and say good morning, some of them would speak, some 
wouldn't, and I would go on one side of the room, on the other 
side with my kids...." J.A. at 618. Marshall said that he 
feared physical violence would erupt. J.A. at 649. In Octo-
ber, Cooks, Overton and Douglas all complained to Storey 
that they felt they were being taunted by the Latina employ-
ees who continuously spoke only Spanish in their presence, an 
occurrence that became more frequent after the press inter-
views.

The Radio Interview

 In November 1996, Garcia arranged an interview with 
himself, Ramirez and Perez at a Spanish-language radio 
station in San Francisco. The three talked, in Spanish, about 
the language policy problem at FSA. Perez said in the 
interview that "Even with the parents themselves who don't 
understand the language, English, we're told that we have to 
talk to them in English even though they [ ] talk to us in 
Spanish...." J.A. at 779. Garcia explained that his Union 
was trying hard to organize the public sector because "there 
are many conditions similar to what Sandra and Lourdes are 
expressing here." J.A. at 792. He continued, "[W]e also 
found that there were other workers, non-Latinos who were 
also suffering from mistreatment and from, from low wages 
and exploitation that they were enduring. That is we came to 
find out that there were many more problems than about 
Spanish but the Spanish problem was one that stood out 
because of the magnitude of it." J.A. at 793. Ramirez and 
Perez played a tape of the interview during the lunch hour of 


the Latina employees, although there is no evidence that any 
African-American workers heard the broadcast. Jones testi-
fied that she heard someone utter the words, in English, 
"black monkey," but she did not know whether the words 
came from the tape or from Perez, who was in the room. The 
transcript from the interview does not contain those words in 
English or Spanish. J.A. at 774-95. Soon after, at Thanks-
giving, the traditional school-wide potluck degenerated into 
two separate luncheons, one for African-Americans and one 
for Latinas.

The Workplace Visits

 During the organizing period, Garcia and another Union 
organizer, Doris Mitchell,5 occasionally came to the Bryant 
Street premises to talk to employees, usually during the 12:30 
lunch hour. Storey testified that she saw Mitchell "six or 
seven times" on the premises, but Storey's only confrontation 
with Mitchell occurred in August 1996, when she came across 
Mitchell conversing with employees in the lunchroom. Storey 
opened the door and closed it, and thought she heard Mitchell 
shouting and laughing at her. This happened again, and 
Storey left. Mitchell left shortly thereafter. J.A. at 540-41. 
Later, in early December, Storey had an encounter with 
Garcia, who was in the lunchroom during the 12:30 period. 
Storey asked Garcia to leave, and he refused. J.A. at 544. 
Storey left to go to her office to call the police, and Garcia 
"came up to the office and he said to me he had every right 
to, in a loud manner, to be there." Id. Garcia announced 
that he would stay until 1:30 and then depart--which he did. 
The police were never summoned and there were apparently 
no witnesses to the encounter in the office. J.A. at 545.

The Vote

 On January 8, 1997, the day of the election, there was a 
pre-election meeting with the NLRB agent to discuss the 
rules for voting. Witnesses agreed that the Board agent did 

__________
 5 Mitchell is African-American and ran the first few Union meet-
ings in the summer of 1996, until Garcia took over.

not establish a "no-electioneering" zone and did not issue 
rules governing the conduct of employees during the voting 
period. An FSA employee, Jaynie Lara, was appointed to 
read the voting "script" to the workers in each classroom and 
to escort employees from their classrooms or the office to the 
lunchroom, where votes were cast. At one point during the 
hour and a half voting period, according to Lara, she told an 
on-call cook, Arturo Martinez, to sit in a chair outside the 
lunchroom, which was off the main hallway, and wait his turn 
to vote. For approximately 20 minutes, Martinez spoke to 
the voters who, one-by-one, entered and exited the lunch-
room. Lara estimated the number of voters whom Martinez 
addressed as 10. Martinez told the employees in Spanish to 
"stick together" and "vote for the union," according to Lara, 
and also asked them how they had voted. J.A. at 434. Lara 
also recalled that three employees stood clustered in the door 
of Room 7/9 for about half an hour during the voting and 
made similar comments to voters; two employees behaved 
similarly in the doorway of Room 5 for about 20 minutes. It 
appears from the record that one of these rooms is across the 
hall from the lunchroom, and the other diagonal from it. 
Also, after Lara had read her script to the voters in Room 7/9 
and Room 5, the supervising teacher in each room--Ana 
Hernandez and Esperanza Reveles, respectively--told the 
voters to make sure they voted for the union.

 II. Discussion

 We will affirm the Board's decision to order collective 
bargaining in the face of objections to the Union's representa-
tion if the decision is reasonable and if the Board's underlying 
findings of fact are supported by substantial evidence on the 
record as a whole. See E.N. Bisso & Son v. NLRB, 84 F.3d 
1443, 1445 (D.C. Cir. 1996). The Board must determine 
whether the challenged conduct tended to interfere with 
employees' free exercise of the franchise. See Amalgamated 
Clothing & Textile Workers Union v. NLRB, 736 F.2d 1559, 
1562 (D.C. Cir. 1984). This is a fact-intensive determination 
especially suited for Board review. See id. ("important in 
counseling deference to Board decisions ... is the fact that 


the Board's particular expertise qualifies it--rather than the 
courts--to decide whether to call for a rerun election"). A 
hearing officer "is '[ ] far better situated than are we to draw 
conclusions about a matter as ephemeral as the emotional 
climate of the [workplace] at the time of the election.' " E.N. 
Bisso & Son, 84 F.3d at 1444 (citation omitted). As a general 
matter, the burden is on the party seeking to overturn a 
Board-conducted representation election to establish that the 
election was not fairly conducted. See Amalgamated Cloth-
ing Workers of America v. NLRB, 424 F.2d 818, 827 (D.C. 
Cir. 1970) (citing Southwestern Portland Cement Co. v. 
NLRB, 407 F.2d 131, 134 (5th Cir. 1969)). A court will 
overturn the Board's decision to certify a bargaining unit only 
where the activities of union supporters created " 'an atmo-
sphere of fear and coercion which made a free and fair 
election impossible.' " Amalgamated Clothing & Textile 
Workers Union, 736 F.2d at 1562 (quoting Daylight Grocery 
Co. v. NLRB, 678 F.2d 905, 909 (11th Cir. 1982)).

 A.Racial Appeals During Election Campaign

 FSA objected after the election that "[t]he union and its 
supporters and agents conducted a campaign and engaged in 
tactics and conduct designed to pit Latino workers against 
African-American and other non-Latino workers, thereby 
basing their campaign on racial and ethnic prejudice and 
discrimination," and also that "[b]y ... appeals to racial and 
ethnic prejudice, the union unlawfully coerced, intimidated 
and interfered with the rights of eligible voters, and de-
stroyed the laboratory conditions necessary for a valid elec-
tion." J.A. at 44 (letter to NLRB, January 15, 1997). The 
hearing officer rejected this objection, we think reasonably.

 We begin with the law that governs the use of race-based 
messages in union campaigns. The principle that the party 
challenging the election bears the burden of proving its 
invalidity gives way if the party that prevailed in the election 
used racial propaganda in an irrelevant and inflammatory 
manner. If the prevailing party inflamed racial prejudice to 
garner pro- or anti-union support, then it must prove that its 
race-laden statements were truthful and germane to the 


unionization effort. The Board has articulated the perimeters 
of racially charged but permissible campaign statements and 
messages:

 ... [A] relevant campaign statement is [not] to be 
 condemned because it may have racial overtones.... 
 We would be less than realistic if we did not recognize 
 that such statements, even when moderate and truthful, 
 do in fact cater to racial prejudice. Yet we believe that 
 they must be tolerated because they are true and be-
 cause they pertain to a subject concerning which employ-
 ees are entitled to have knowledge....

 So long, therefore, as a party limits itself to truthfully 
 setting forth another party's position on matters of racial 
 interest and does not deliberately seek to overstress and 
 exacerbate racial feelings by irrelevant, inflammatory 
 appeals, we shall not set aside an election on this ground. 
 However, the burden will be on the party making use of 
 a racial message to establish that it was truthful and 
 germane, and where there is doubt as to whether the 
 total conduct of such party is within the described 
 bounds, the doubt will be resolved against him.

Sewell Manuf. Co., 138 N.L.R.B. 66, 71-72 (1962) (footnote 
omitted) (emphasis in original).

 Applying Sewell, we look first to whether the Union delib-
erately drove a wedge between African-American and Latina 
co-workers by racial baiting--namely, by assailing the cen-
ter's alleged language policy in a way that was inflammatory 
and irrelevant to the campaign and by failing to ensure the 
inclusion of African-Americans during the membership drive.6 

__________
 6 The parties do not dispute that the Union's alleged targeting of 
members based on race should be considered under the Sewell 
analysis. We note and adopt the Fifth Circuit's view on this issue:

 That the Union's appeal in this case was predominately to [one 
 race] does not in itself tell us either that race was the theme of 
 the campaign, or that the Union's appeal was inflammatory. 
 Rather, we think the racial one-sidedness of the Union's effort 
 should be given the analytical effect in our review of intensify-

Our sister circuits have approached this task by examining 
the tenor and relevance of the union's race-based message as 
well as the degree to which the message formed the "core" of 
the unionization drive. See, e.g., M & M Supermarkets, Inc. 
v. NLRB, 818 F.2d 1567 (11th Cir. 1987); NLRB v. Utell 
Int'l, Inc., 750 F.2d 177 (2d Cir. 1984); NLRB v. Silverman's 
Men's Wear, Inc., 656 F.2d 53 (3d Cir. 1981); Peerless of 
America, Inc. v. NLRB, 576 F.2d 119 (7th Cir. 1978); NLRB 
v. Bancroft Manuf. Co., 516 F.2d 436 (5th Cir. 1975). The 
more outrageous and inflammatory the statement, the less 
important the question whether it formed the "core" of the 
campaign, and the more difficult it becomes for its sponsor to 
prove its relevance and truth. For example, in Silverman's 
Men's Wear, the Third Circuit held that the NLRB erred in 
not holding a hearing based on evidence proffered by the 
employer that a union official called a company official a 
"stingy Jew" in front of 20 employees shortly before the 
election. 656 F.2d at 57-58. Although the statement stood 
alone and did not comprise a core campaign issue, the court 
found it to be so inflammatory that the "Union clearly could 
not have met" its burden of proving it was actually relevant. 
Id. at 58; see also M & M Supermarkets, 818 F.2d at 1573-74 
(one employee's reference to employers as "those damned 
Jews" at a single meeting enough to invalidate election); cf. 
Utell Int'l, 750 F.2d at 179 ("the Sewell test for truth and 
relevancy ... is applicable only to inflammatory racial ap-
peals").7

__________
 ing the scrutiny with which we regard the incidents of the 
 Union's "appeal to race hatred" cited by the Company.

NLRB v. Sumter Plywood Corp., 535 F.2d 917, 926 (5th Cir. 
1976) (footnote omitted).

 7 The Fifth Circuit appears to have adopted the approach that if a 
racial message forms either the core of the campaign or is inflam-
matory, the burden shifts to the sponsor to prove that the state-
ment was truthful and relevant to the campaign. See Sumter 
Plywood, supra note 6, at 925 ("the reversal of burden of persua-
sion occurs if the racial remarks 'form the core or theme of the 
campaign,' or if the statements are racially inflammatory") (citation 
omitted); Bancroft Manuf., 516 F.2d at 442-43. Instead, we adopt 

 It is permissible for a union to promulgate a message that 
is wholly relevant and accurate, even though it implicates 
race. A "union's claim that management discriminated on the 
basis of race, sex and national origin [is] not an inflammatory 
racial appeal." State Bank of India, 808 F.2d at 542; cf. 
Utell Int'l, 750 F.2d at 178-79. The hearing officer in this 
case reasonably concluded that the Union's and employees' 
statements and actions regarding the language issue amount-
ed to no more than a claim of discrimination. Lourdes Perez' 
notation on the June 26 meeting form that Latina employees 
had been forbidden from speaking Spanish, the subsequent 
skirmishes over language issues between Latina employees 
and their supervisors, Latina employees' complaints to the 
news media that their supervisors harangued them to speak 
English, and the similar comments made during the radio 
interview do not appear to be empty claims aimed at provok-
ing racial hatred. We reach this conclusion without deciding 
whether these acts were attributable to the Union. See 
NLRB v. Herbert Halperin Distributing Corp, 826 F.2d 287, 
291 (4th Cir. 1987) (question is whether the "amount of 
association between the union and the [employees] is signifi-
cant enough to justify charging the union with the conduct") 
(quotation omitted). By so doing, we subject the Union to a 
standard more stringent than that other courts have required 
when examining the actions of third parties: Where the 
Union sponsored the race-based message, the election must 
be set aside if the message was inflammatory and inspired an 
atmosphere of fear and coercion. Cf. id. at 290 (election set 
aside because of third-party conduct only if election was held 
in "a general atmosphere of confusion, violence, and threats of 
violence...") (citation omitted). Even assuming arguendo 
that the Union was responsible for the turmoil over the 
alleged existence of a language policy, we are unable to 

__________
the Second and Seventh Circuits' sliding scale approach, in which 
we assess together the degree of the message's relevance and 
importance. See Utell Int'l, 750 F.2d at 179; State Bank of India v. 
NLRB, 808 F.2d 526, 541 (7th Cir. 1986). Otherwise, the promul-
gation of a "core" yet tempered and relevant race-based message 
would unnecessarily require further and redundant examination.


identify any statements or actions it made that were so 
inflammatory and irrelevant that the Board's contrary conclu-
sion must be overturned. The comments reported in the San 
Francisco Examiner article and the statements made in the 
radio interview appear to us, as to the Board, to be reason-
ably accurate descriptions of the situation as Garcia and the 
Latina employees perceived it to be and not calculated to 
spark racial prejudice.8 Written records--namely, from the 
June 5 staff meeting in Room 2--and the testimony of Vivian 
Storey as to her encounters with Latina employees may tend 
to support FSA's contention that there was no official "En-
glish-only" policy. However, the hearing officer found that 
employees' testimony to the contrary was credible, and it is 
not necessary to determine whether there actually existed an 
established English-only policy; the relevant point is that the 
Board could reasonably find, in this conflicted record, that the 
Latina employees' allegations that one existed were not reck-
less, capricious, or otherwise emblematic of an intent to 
invoke racial hatred. The subsequent conflict over the use of 
Spanish in the presence of non-Spanish speaking employees, 
the complaints by African-American workers about feeling 
excluded among Spanish speakers, and the racial bifurcation 
of the Thanksgiving dinner illustrate the racial tension at 

__________
 8 FSA asserts that Garcia made inflammatory misrepresentations 
to the Latina employees by telling them that they had an "absolute 
right" to speak Spanish on the job. Petitioner's (Pet.) Br. at 23. 
Garcia himself said he told the employees that he thought the 
policy, if it existed, was "illegal or [wrong]," and Perez testified that 
Garcia told her that she had a "right" to speak Spanish. J.A. at 
737-38; 719-20. FSA argues that this statement was wrong in 
light of Garcia v. Spun Steak, 998 F.2d 1480 (9th Cir. 1993) (holding 
that, in the circumstances presented in that case, an English-only 
policy in the workplace could not constitute a violation of Title VII), 
but this legal conclusion, alone, is not sufficient to render Garcia's 
statements prejudicial enough to invalidate the election. See Utell, 
750 F.2d at 179-80 (in case of alleged misrepresentation, Board is to 
consider, inter alia, other party's opportunity to correct the misrep-
resentations before invalidating election).


FSA but do not necessarily lead to the conclusion that the 
Union was igniting prejudice. The hearing officer did not 
credit Jones' testimony that the words "black monkey" were 
actually uttered, J.A. at 67, and there is no reason in the 
record for us to disturb this finding. See E.N. Bisso & Son, 
84 F.3d at 1444-45 (hearing officer is "uniquely well-placed to 
draw conclusions about credibility") (citation and quotation 
omitted).

 We stress that we do not endorse what appears from most 
accounts to have been a palpable disinterest by the Union in 
non-Latino workers and the resulting de facto segregation of 
employees during the organizing drive. See Sumter Ply-
wood, 535 F.2d at 926 ("This concentration on voters of one 
race, to the relative exclusion of voters of the other, is 
disturbing and is not to be condoned"). Yet even considering 
this lamentable behavior towards African-American workers, 
we nonetheless agree with the Board that there was nothing 
in this tendentious campaign that made "impossible a sober, 
informed exercise of the franchise." Sewell Manuf., 138 
N.L.R.B. at 71.

 B.Supervisory Taint in the Election Process

 FSA objected that the "petition and election process were 
unlawfully tainted by the inclusion of statutory supervisors," 
J.A. at 44. The threshold question in a supervisory taint 
claim is, of course, whether the accused parties were in fact 
"supervisors" under the NLRA. See Westwood One Broad-
casting Servs., Inc., 323 N.L.R.B. 1002 (1997), enforced 159 
F.3d 1352 (3d Cir. 1998). This issue could have been litigated 
at FSA's behest during the representation stage of these 
proceedings. In fact, FSA initially challenged the presence of 
supervising teachers in the bargaining unit. See 29 U.S.C. 
s 152(3) (excluding from its definition of covered "employee 
... any individual employed as a supervisor"). After a 
hearing on the matter, the Regional Director found that the 
supervising teachers were not statutory supervisors under 
the NLRA, but on appeal the Board amended the Regional 
Director's decision to permit the teachers to vote subject to 
challenge. See J.A. at 101 n.3 (Decision and Certification of 


Representative, October 17, 1997). At the pre-election con-
ference, the Employer's representative explicitly withdrew 
the challenge to the eligibility of the supervising teachers. 
See id.

 In issuing its Certificate of Representative, the Board 
denied FSA's post-election objection based on supervisory 
taint because it was "in the nature of postelection challenges 
which the Board has held that it will not entertain." J.A. at 
101. The Board has long refused to hear challenges to votes 
brought for the first time after an election, as well as objec-
tions that are merely reformulated challenges to votes. See, 
e.g., NLRB v. A.J. Tower Co., 329 U.S. 324, 332 (1946); Prior 
Aviation Serv., Inc., 220 N.L.R.B. 460, 461 n.3 (1975) (listing 
cases). The difference between objections and challenges is 
that "[o]bjections relate to the working of the election mecha-
nism and to the process of counting the ballots accurately and 
fairly. Challenges, on the other hand, concern the eligibility 
of prospective voters." A.J. Tower Co., 329 U.S. at 334. The 
ban on post-election challenges is traditionally employed 
when one party files a post-election "objection" that directly 
challenges the eligibility of a voter that was not raised 
previously. See Prior Aviation Serv., Inc., supra, at 460 (ban 
on post-election challenges applied to objection that alleged 
employee "was an ineligible voter by reason of his superviso-
ry status"). Otherwise, as the Supreme Court has observed, 
losing parties would be able to lodge attacks on elections ad 
infinitum, "delay[ing] the finality and statutory effect of the 
election results." A.J. Tower Co., 329 U.S. at 332.

 The Board in this case not unreasonably relied on the ban 
on post-election challenges to bar FSA's attempt to revisit the 
issue of the teachers' supervisory status after the election, 
since FSA had explicitly abandoned that same challenge 
before the election. But it is not clear that the ban will take 
it the whole way, because, as noted above, it has traditionally 
been limited to challenges to votes or the constituency of the 
bargaining unit. However, the Board does allude briefly to a 
collateral estoppel argument which we find more compelling, 
that is, that a party such as FSA here cannot specifically 
withdraw its challenge to certain voters as supervisors and 


later allege that they are indeed supervisors whose partic-
ipation in the disputed election has "tainted" it. See J.A. at 
101 n.3.

 Thus, since FSA withdrew its challenge to the supervisory 
status of the teachers pre-election, it was subsequently es-
topped from litigating the issue post-election, and as the 
Board found in its Decision and Order in the instant section 
8(a)(5) refusal-to-bargain proceeding, see J.A. at 135, cannot 
now reopen the record of the representation proceeding to 
attempt again to litigate this issue. Board rules bar reopen-
ing the record to litigate issues in related unfair labor prac-
tice proceedings that the Board could have reviewed in the 
representation proceeding. See 29 C.F.R. s 102.67(f).9 And 
FSA "fail[ed] to request review" of whether a supervising 
teacher is a statutory supervisor prior to the election, thereby 
precluding it from "relitigating, in any related subsequent 
unfair labor practice proceeding, any issue which was, or 
could have been, raised in the representation proceeding." 
Id. We have, it is true, previously held that a union is not 
barred under this rule from relitigating representation issues 
when it brings unfair labor practice charges under sections 
8(a)(1) and 8(a)(3)10 of the NLRA because such charges do not 

__________
 9 Section 102.67(f) states: "The parties may, at any time, waive 
their right to request review. Failure to request review shall 
preclude such parties from relitigating, in any related subsequent 
unfair labor practice proceeding, any issue which was, or could have 
been, raised in the representation proceeding. Denial of a request 
for review shall constitute an affirmance of the regional director's 
action which shall also preclude relitigating any such issues in any 
related subsequent unfair labor practice proceeding."

 10 These sections provide, in relevant part:

 (a) Unfair labor practices by employer

 It shall be an unfair labor practice for an employer--

 (1) to interfere with, restrain, or coerce employees in the 
 exercise of the rights guaranteed in section 157 of this title;

 ...

constitute a "related subsequent unfair labor practice pro-
ceeding" (emphasis added). See Thomas-Davis Med. Ctrs. v. 
NLRB, 157 F.3d 909, 913 (D.C. Cir. 1998); Clark & Wilkins 
Indus., Inc. v. NLRB, 887 F.2d 308, 316 (D.C. Cir. 1989). 
Similarly, an employer in a subsequent section 8(a)(1) or 
8(a)(3) proceeding is not barred from raising a defense that 
was or could have been litigated in the representation pro-
ceeding. See Intermountain Rural Elec. Ass'n v. NLRB, 732 
F.2d 754, 760-61 (10th Cir. 1984)) (permitting confidential 
employee defense). By contrast, a section 8(a)(5) case based 
on an employer's technical refusal to bargain in order to 
obtain review of the representation proceeding is necessarily 
a "related subsequent unfair labor practice proceeding." See 
Amalgamated Clothing Workers of America, AFL-CIO v. 
NLRB, 365 F.2d 898, 903 (D.C. Cir. 1966) (a company's 
appeal to the court in a refusal to bargain proceeding must be 
"based on the record made at the earlier representation 
hearing"); see also NLRB v. Hydro Conduit Corp., 813 F.2d 
1002, 1005 (9th Cir. 1987); Intermountain Rural Elec., 732 
F.2d at 760-61; Rock Hill Tel. Co. v. NLRB, 605 F.2d 139, 
143 (4th Cir. 1979); Heights Funeral Home, Inc. v. NLRB, 
385 F.2d 879, 881-82 (5th Cir. 1967). Accord Hyatt Hotels, 
Inc., 256 N.L.R.B. 1099 (1981) (in refusal to bargain proceed-
ing, no relitigation of supervisory status of pro-union employ-
ee who was alleged by employer to have interfered with the 
election). Since the record shows that FSA waived its right 
to request review of the supervisory status of the supervising 
teachers during the representation proceeding, relitigation of 
the supervisory taint issue is precluded.

 C.Unlawful Electioneering

 Another of FSA's objections was that "Union supporters 
and agents engaged in unlawful electioneering, coercion, in-
timidation and interference in the vicinity of the polling place 
during the election." J.A. at 45. We believe that the Board 

__________
 (3) by discrimination in regard to hire or tenure of employment 
 or any term or condition of employment to encourage or 
 discourage membership in any labor organization....

29 U.S.C. s 158(a).

reasonably concluded that the electioneering at Bryant Street 
on the day of the election was within the permissible range.

 The Board has repeatedly declined to impose a zero-
tolerance rule on voting day electioneering. See Overnite 
Transp. Co. v. NLRB, 140 F.3d 259, 269 (D.C. Cir. 1998) 
(citing Boston Insulated Wire & Cable Co., 259 N.L.R.B. 
1118, 1118 (1982), enforced, 703 F.2d 876 (5th Cir. 1983)); see 
also NLRB v. Duriron Co., 978 F.2d 254, 256 (6th Cir. 1992) 
(" 'Laboratory conditions' are not always achieved in practice, 
and elections are not automatically voided whenever they fall 
short of perfection."). "Instead, the Board considers a range 
of factors and circumstances in determining whether election-
eering activity is sufficient to justify overturning an election." 
Overnite Transp., 140 F.3d at 269. The Board has considera-
ble discretion to determine whether the circumstances of an 
election have enabled employees to exercise free choice in 
casting their ballots. Id. When "prolonged conversations 
between representatives of any party to the election and 
voters waiting to cast ballots" take place, Milchem, Inc., 170 
N.L.R.B. 362, 362 (1968), the Board will order a new election. 
Cf. NLRB v. Del Rey Tortilleria, Inc., 823 F.2d 1135 (7th Cir. 
1987) (Milchem does not require new election when union 
representative spoke with employees lined up on sidewalk 
before polls open).

 But where, as here, the electioneering did not involve union 
agents, the Board will overturn the election "only if the 
electioneering 'substantially impaired the exercise of free 
choice.' " Overnite Transp., 140 F.3d at 270 (citing Del Rey 
Tortilleria, 823 F.3d at 1140 (citation omitted)).

 The Board generally considers the nature and extent of 
 the electioneering, whether it happened within a desig-
 nated "no electioneering" area, whether it was contrary 
 to the instructions of the Board's election agent, whether 
 a party to the election objected to it, and whether a party 
 to the election engaged in it.

Id. at 270. In this case, the Board agent did not designate a 
"no-electioneering zone" outside of the lunchroom. FSA 
urges us to consider Pepsi-Cola Bottling Co. of Petersburg, 


Inc., 291 N.L.R.B. 578 (1988), in which the Board found that 
unlawful electioneering had occurred within a prima facie 
"no-electioneering" zone even though none had been estab-
lished before the election. In Pepsi-Cola Bottling, however, 
the Board determined that this "no electioneering" zone 
existed where employees waited in line to vote. By contrast, 
as the Board correctly found in the instant case, employees 
did not wait outside the lunchroom to vote. There was thus 
no area where employees stood as a captive audience, waiting 
to cast their ballots, that should have been considered off-
limits as a matter of law. Applying the other factors, the 
employees did not act contrary to any of the instructions of a 
Board agent, see Star Expansion Indus. Corp., 170 N.L.R.B. 
364 (1968) (agent of union asked to leave no-electioneering 
zone three times). Nor does FSA contend that it objected to 
the activities of the Union's supporters at the time employees 
entered or exited the voting place.

 Finally, the general "nature and extent" of the electioneer-
ing in this case did not substantially impair employees' ability 
to exercise free will at the ballot box. The Board reasonably 
found that the combined effect of the relatively brief inter-
ludes of electioneering by teachers as voters exited and 
entered classrooms 5 and 7/9, as well as Martinez' occasional 
comments as he sat outside the lunchroom waiting to vote, 
was not coercive. Compare Claussen Baking Co., 134 
N.L.R.B. 111 (1961) (prolonged antiunion discussion between 
a leadman and several new employees within 15 feet of the 
poll in no-electioneering zone, with a plant manager standing 
nearby, and which was stopped only by intervention of the 
Board agent, required that election be set aside), with Duri-
ron, 978 F.2d at 258 (no new election where pro-union em-
ployees gathered in hallways for an hour during voting period 
within 15 to 20 feet of polling place and discussed pro-union 
position with employees in their work areas); Boston Insulat-
ed Wire & Cable Sys. v. NLRB, 703 F.2d at 880-81 (no new 
election where union agents leafletted outside doors as em-
ployees entered building and proceeded down corridor to 
vote); and Southeastern Mills, Inc., 227 N.L.R.B. 57 (1976) 
(no new election where pro-union employee sat for 20 minutes 


near employees waiting in line to vote, loudly predicted their 
votes and stated that he hoped they had voted right). That 
the classrooms were located just across the hall from the 
voting area is acknowledgedly troubling, because it allowed at 
least some voters to be subjected to pro-union campaigning 
up to the last moments before they cast their ballots. Simi-
larly, the Union supporters' inquiries to voters leaving the 
polling place as to how they cast their ballots is not paradig-
matic of sterile "laboratory conditions." However, ultimately, 
we defer to the Board's reasoned conclusion that neither of 
these occurrences tend to intimidate voters in light of the fact 
that employees were not standing in line to vote as a captive 
audience to the union supporters' comments, there was no "no 
electioneering" zone, and further, that no evidence was ad-
duced that voters were forced to contend with a constant 
barrage, as opposed to an intermittent sprinkling, of pro-
union advocacy.

 D.Union Agents' Invasion of the Workplace

 FSA also alleged that "Union agents repeatedly invaded 
the employer's workplace during working times to engage in 
electioneering with employees, deliberately creating hostile 
confrontations with management and refusing to leave when 
lawfully asked to do [sic]." J.A. at 45. This objection must 
also fail. When a party to an election is alleged to have 
engaged in conduct requiring the overturning of the election 
results, the Board, and we, employ a standard similar to the 
one used with allegations of improper electioneering. "[T]he 
Board judges the conduct by assessing whether it 'reasonably 
tend[ed] to interfere with the employees' free and uncoerced 
choice in the election.' " NLRB v. Earle Industries, Inc., 999 
F.2d 1268, 1272 (8th Cir. 1993) (quoting Baja's Place, Inc., 
268 N.L.R.B. 868, 868 (1984)). The factors the Board consid-
ers include: the number of incidents of misconduct; the 
severity of the incidents and whether they were likely to 
cause fear among the employees in the bargaining unit; and 
the proximity of the misconduct to the election date. See id.; 
see also Avis Rent-A-Car Sys., Inc., 280 N.L.R.B. 580 (1986).


 Here, as the Board correctly found, Mitchell and Garcia 
made several visits to the Bryant Street site but only two 
alleged "incidents" of misconduct occurred. Site Supervisor 
Storey's brief run-in with Mitchell could hardly be described 
as likely to induce fear among employees; it was not confron-
tational and there is no evidence that Mitchell was even asked 
to leave. Although there were witnesses to Storey's initial 
encounter with Garcia, that encounter consisted only of Gar-
cia's telling Mitchell that he had a right to be on the premis-
es. The evidence does not reflect that there were any 
witnesses to the subsequent, slightly more rancorous encoun-
ter in the office. Even so, whatever employee angst may 
have resulted from these two encounters surely dissipated by 
election day--one incident occurred five months and the other 
one month before the election. Cf. Wilkinson Mfg. Co. v. 
NLRB, 456 F.2d 298, 303-04 (8th Cir. 1972) (two month 
interval before election not enough if the incident had been a 
constant topic of discussion and concern); Station Operators, 
307 N.L.R.B. 263 (1992) (fact that incident occurred two 
weeks before election supported finding that pre-election 
misconduct did not taint election). This case is thus distin-
guishable from Phillips Chrysler Plymouth, Inc., 304 
N.L.R.B. 16 (1991), where union agents engaged in a shouting 
match with the company's president in front of all 10 mem-
bers of the bargaining unit an hour before the polls opened 
and refused to leave even after the company called the police. 
These two run-ins did not rise to the level of interfering with 
employees' free and uncoerced choice in the election.

 E.Compliance with the LMRDA Reporting Requirement

 Finally, FSA objected that the Union is not a bona fide 
labor organization under the NLRA for purposes of repre-
senting employees because it "unlawfully failed and refused to 
file any of the financial and other reports required of all 
private sector unions." J.A. at 44. FSA asserted that "the 
union's refusal to file was a violation of employees' Section 7 
rights to know about union finances and other matters in 
order to make an informed election choice...." Id. The 
LMRDA requires labor unions to file certain financial disclo-
sure reports. See 29 U.S.C. ss 431(a), 431(b), 432 & 435; see 


generally Brennan v. Local Union 10, 527 F.2d 588 (9th Cir. 
1975). Section 2(5) of the NLRA, which makes no reference 
to these reporting requirements, merely defines a "labor 
organization" as including "any organization of any kind ... 
in which employees participate and which exists for the 
purpose, in whole or in part, of dealing with employers 
concerning grievances, labor disputes, wages, rates of pay, 
hours of employment, or conditions of work." 29 U.S.C. 
s 152(5). In the course of pre-election proceedings in the 
instant case, the Regional Director concluded that compliance 
with the LMRDA was not relevant to the union's status as a 
labor organization under the NLRA. See J.A. at 21-22. The 
hearing officer, and the Board in turn, adopted this conclu-
sion. Desert Palace, Inc., 194 N.L.R.B. 818, 818 n.5 (1972) 
("The NLRB is not entrusted with the administration of the 
[LMRDA]. An organization's possible failure to comply with 
that statute should be litigated in the appropriate forum 
under that act, and not by the indirect and potential duplica-
tive means of our consideration...."); see also S.H. Kress & 
Co., 212 N.L.R.B. 132 (1974). In a case in which a company 
argued that a labor union should not be entitled to an order 
directing an election because of, inter alia, numerous internal 
problems and possible mob influence, the Board concluded:

 The allegations made by [the company] ... concern 
 improper or corrupt practices in the administration of 
 internal union affairs. In ... the [LMRDA], Congress 
 expressly dealt with such matters. It is particularly signifi-
 cant that the remedies provided in the LMRDA were given 
 to individual employees directly, and to the public through 
 the intervention of [other departments]. The theory un-
 derlying this type of remedial legislation is not to "illegal-
 ize" the organization itself, but to afford protection to all 
 parties concerned by creating specific Federal rights and 
 remedies whereby the activities of the organization and its 
 officers and agents are regulated and subjected to judicial 
 review in vindication of those rights. Had Congress de-
 sired to strike directly at the organization itself, Congress 
 would have said so.


Alto Plastics Manuf. Corp., 136 N.L.R.B. 850, 853 (1962). In 
oral argument, FSA attempted to distinguish Alto Plastics 
from this case because the company in Alto Plastics had 
sought directly to invoke the Board's jurisdiction to hear a 
complaint brought under the LMRDA, whereas here, FSA is 
not asking the Board to adjudicate the LMRDA issue. How-
ever, this analysis ignores the basic point of Alto Glass, which 
is applicable here: the LMRDA is simply "not relevant or 
material to the issue of [the Union's] status as a labor 
organization," at least in the circumstances of this case. Id. 
at 851.11

 Conclusion

 For the reasons stated above, we deny FSA's petition for 
review and grant the Board's petition for enforcement of its 
Decision and Order.

So ordered.

__________
 11 In oral argument and in the Reply brief, counsel for FSA 
contended that the company's argument is not premised on compli-
ance with the NLRA's definition of a "labor organization," but 
rather on the theory that a violation of employees' section 7 rights 
under the NLRA is itself a form of election-related misconduct. 
However, FSA has failed to point to any evidence in the record that 
would show the alleged section 7 violation "reasonably tend[ed] to 
interfere with the employees' free and uncoerced choice in the 
election." Baja's Place, 268 N.L.R.B. at 868. We therefore reject 
this theory as well.